FILED
2024 May-31  PM 02:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DIVISION OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DEMETRIUS WEBB; | ) | |
| | ) | |
| Plaintiff; | ) | Case No.: 2:23-cv-01098-RDP |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF HOMEWOOD, ALABAMA, | ) | |
| CHIEF NICHOLAS HILL, In His | ) | |
| Individual Capacity; | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANTS CITY OF HOMEWOOD AND  CHIEF HILL'S MEMORANDUM**
**<u>SUPPORTING MOTION FOR SUMMARY JUDGMENT</u>**

Michael G. Kendrick
Wayne Morse
WALDREP STEWART &
KENDRICK LLP
2850 19th Street South
Suite 370
Homewood, Alabama 35209
Telephone:     (205) 254-3216
Facsimile:     (205) 547-9741

Attorneys for the City of Homewood and
Chief Nicholas Hill

<u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION ........................................................................................................1

II.     STATEMENT OF FACTS ........................................................................................1

        A.      Facts relevant to the failure to promote claim. ........................................1

        B.      Facts relevant to retaliation claim. ............................................................6

III.    STANDARD OF REVIEW ......................................................................................17

IV.     POINTS AND AUTHORITIES. .............................................................................17

        A.      The "failure to promote" claim fails. ......................................................17

        B.      Captain Webb's claim for retaliation against Chief Hill fails.................22

V.      CONCLUSION.........................................................................................................26

## I.    INTRODUCTION

This complaint, as amended, centers on Captain Demetrius Webb's failure to obtain the position of Battalion Chief at the City of Homewood's Fire Department. He sues the City for racial discrimination under Title VII and Chief Nicholas Hill for retaliation under 42 U.S.C. §1981 and 42 U.S.C. § 1983.

Captain Webb claims that he was not promoted because of his race. He alleges also that Chief Hill retaliated against him after he filed an EEOC Charge by forcing him to take multiple physical exams, and after he refused the medical exams, Chief Hill moved him to an administrative role where he would not be responding to calls. Captain Webb alleges moving him from the field was retaliation.

It is self-evident and common sense that a firefighter must be physically fit for the job and that the Fire Chief must ensure each firefighter's capacity to perform for the safety of the public, co-workers, and the firefighter himself. Captain Webb did not want to undergo the necessary medical exams to ensure his ability to take a firefighter job test evaluating his physical ability to perform. In fact, Captain Webb said he was not sure he could pass the strenuous job test. Homewood and Chief Hill could not allow Captain Webb, a man with myriad risk factors, to endanger others and himself. He was not fired. Captain Webb was asked merely to do what every firefighter had to do to do, and he did not suffer a loss of pay or benefits. The claims fail because they lack actual support and do not withstand legal scrutiny.

## II.    STATEMENT OF FACTS

A.    <u>Facts relevant to the failure to promote claim.</u>

1.    Captain Webb started working in the Homewood Fire Department in 1985. (EFC Doc 32-1, Ex. A, Capt. Webb Depo. p. 76.)

2.      Captain Webb was promoted to apparatus operator in 2006 and to Lieutenant in 2007. (EFC Doc 32-1, Ex. A, Capt. Webb Depo. p. 75.)

3.      Captain Webb was promoted to Captain in 2017. (EFC Doc 32-2, Ex. B, Chief Hill Depo pp. 236-236.)

4.      The Captain position did not exist in Homewood until 2017. (EFC Doc 32-2, Ex. B, Chief Hill Depo pp. 236-236.)

5.      The Homewood Fire Department has four Battalion Chiefs, each with a different role. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 165.)

6.      The Battalion Chief position was created in 2004 or 2005. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 216.)

7.      Homewood has had nine or ten Battalion Chiefs since 2004. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 217.)

8.      Homewood has had only two black applicants for the Battalion Chief position, including Captain Webb. (EFC Doc 32-2, Ex. B, Chief Hill Depo. pp. 215-217)

9.       The Battalion Chief is chosen by the Fire Chief. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 166.)

10.     Chief Hill was the Fire Chief from July 27, 2020 to December 31, 2023. (EFC Doc 32-2, Ex. B, Chief Hill Depo. pp. 14-15.)

11.     When Chief Hill became the Fire Chief, he did away with the prior method of selecting a Battalion Chief, which included a panel interview with members of the department and writing a mission statement. (EFC Doc 32-2, Ex. B, Chief Hill Depo. pp. 168-169.)

12.     Chief Hill was concerned that the process of being selected Battalion Chief was too subjective, so in September or October of 2020, he devised a spreadsheet where the applicants'

qualifications are assigned a number value for various levels of qualifications. (EFC Doc 32-2, Ex. B, Chief Hill Depo. pp. 173-178.)

13.    Chief Hill stated that he looked at an applicant's entire experience, not merely the applicant's time with Homewood. (EFC Doc 32-2, Ex. B, Chief Hill Depo. pp. 198, 212.)

14.    Chief Hill selected Lt. Broadhead for the first open Battalion Chief position. (EFC Doc 32-2, Ex. B, Chief Hill Depo. pp. 189-190, 196-197.)

15.    Although Lt. Broadhead's rank was lower than Captain Webb's rank, Chief Hill testified that "Deputy Chief Broadhead had a natural gift for leadership and administration and outweighed everyone on that scale." (EFC Doc 32-2, Ex. B, Chief Hill Depo. pp. 199-200.)

16.    When promoted to Battalion Chief, Lt. Broadhead had a bachelor's degree, was in the last stages of obtaining a master's degree, and he was a paramedic. (ECF Doc 32-3, Ex. C, Declaration of Chief Broadhead.)

17.    Lt. Broadhead already had some budgetary responsibilities, was good with the public and administration. (EFC Doc 32-2, Ex. B, Chief Hill Depo. pp. 203-205.)

18.    In October 2020, a Battalion Chief position became available. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 189.)

19.    Captain Webb, and another African-American, Captain Robert Harris, applied for the position. (EFC Doc 32-2, Ex.B, Chief Hill Depo. p. 190.)

20.    A Homewood document shows the scores of the Battalion Chief candidates. (EFC Doc 32-4, Ex. D, Criteria Spreadsheet.)

21.    Based on the objective criteria, here are the scores: David Everson, 29; Adam Ashworth, 27; Alexander Glover, 28; Robert Harris, 22; Keith Headrick, 23; Mark Shannon, 29; and Demetrius Webb, 18. (ECF. Doc. 32-2, Ex. B, Chief Hill Depo. p. 194.)

22.    Captain Webb was not a paramedic. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 206.)

23.    Since 1994, Homewood had never had a Battalion Chief who was not a paramedic. (EFC Doc 32-2, Ex.B, Chief Hill Depo. p. 206.)

24.    Being a paramedic is important because approximately 64 to 67 percent of the calls are for emergency medical service. (EFC Doc 32-2, Ex. B, Chief Hill Depo. at 206.)

25.    Captain David Everson was selected as Battalion Chief. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 209.)

26.    In addition to the matrix score and resume, Chief Hill chose Captain Everson because he was already on the B shift and had been second in command for the AMAS team. (EFC Doc 32-2, Ex. B, Chief Hill Depo. pp. 194, 209)

27.    Chief Hill based the promotion decision regarding the next Battalion Chief on the interviews conducted when a Fire Marshall was selected. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 192.)

28.    Shortly after Captain Everson became a Battalion Chief, another Battalion Chief position came available. (ECF Doc 32-2, Ex. B, Chief Hill Depo. p 186.)

29.    Captain Webb had been a Captain longer than Captain Everson, and had been employed by Homewood longer than Captain Everson and Lt. Broadhead. (EFC Doc 32-2, Ex. B, Chief Hill Depo. pp. 197-199, 211.)

30.    But Captain Webb agreed that having the longest years of experience does not necessarily make you the best candidate. (EFC Doc 32-1, Ex. A, Capt. Webb Depo. pp. 85-88.)

31.    Instead, Captain Webb agreed that:

"there is a broad spectrum that involves it. It's knowledge, skills, trustworthiness, integrity. I mean all those things are involved. It's no one set goal or one set thing."

(EFC Doc 32-1, Ex. A, Capt. Webb Depo. pp. 85-88.)

32.     Captain Webb does not know if he was more qualified than Captain Everson to be Battalion Chief because he does not know Captain Everson's qualifications. (EFC Doc 32-1, Ex. A, Capt. Webb Depo. pp. 88-89.)

33.     Captain Webb, however, thinks he was more qualified "[i]n terms of years of service and experience…." (EFC Doc 32-1, Ex. A, Capt. Webb Depo. pp. 88-89.)

34.     Captain Webb admitted that he was not familiar with the test Chief Hill used to evaluate the candidates. (EFC Doc 32-1, Ex. A, Capt. Webb Depo. pp. 91-92.)

35.     Captain Webb cannot say if the test was fair because he does not know what the test is. (EFC Doc 32-1, Ex. A, Capt. Webb Depo. p. 93.)

36.     Captain Webb cannot say if the test used by Chief Hill is discriminatory. (EFC Doc 32-1, Ex. A, Capt. Webb Depo. pp. 94-95.)

37.     In the last twenty years or so, nine or ten black firefighters have been hired by the Homewood Fire Department. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 214.)

38.     Black firefighters are employed by Homewood. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 220.)

39.     Chief Hill was involved in hiring at first, but stepped out of the process in mid-2021. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 224.)

40.     The race of the applicants is not listed on the materials received by the Fire Department, so  Chief Hill had no way to track the number of black applicants. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 223.)

41.    Who the Homewood Fire Department hires has a lot to do with qualifications – if the Department loses a paramedic it tries to replace the departed paramedic with another paramedic. (EFC Doc 32-2, Ex. B, Chief Hill Depo. pp. 221-222.)

42.    Homewood hires people who are already qualified paramedics because doing so saves Homewood approximately $30,000 in training costs, a different business plan than some other Fire Departments, like Birmingham, which hires applicants with no qualifications and trains them. (EFC Doc 32-2, Ex. B, Chief Hill Depo. pp. 230-232.)

43.    Chief Hill believes there may not be a lot of black applicants and sometimes people turn down interviews. (EFC Doc 32-2, Ex. B, Chief Hill Depo. pp. 230-231.)

44.    When asked why it took the length of time it did for Captain Webb to get promoted, Chief Hill gave the following possibilities:

> "Q. Any other explanations for why you think it took Captain Webb so long to be promoted?
>
> A. Well, there's a couple of explanations.
>
> Q. Tell me.
>
> A. If he took the test -- if he applied for the Personnel Board test, if he took it, he either didn't pass with a 70, or he didn't score a high enough grade to get an interview, and he wasn't on the certification list provided by the Personnel Board of Jefferson County. That's the only two things."

(EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 236.)

B.    <u>Facts relevant to retaliation claim.</u>

45.    Over his years with the Homewood Fire Department, Chief Hill had concerns about the physical fitness of the firefighters. (ECF Doc 32-2, Ex. B, Chief Hill Depo. p. 58.)

46.    In August 2020, shortly after becoming Fire Chief, Hill decided that all members in the Homewood Fire Department should take a physical fitness test. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 55.)

47.    Chief Hill decided that the firefighters should take an annual "job task" test:

"Firefighting is a hard job. It's a hard physically demanding job to be able to put on that gear and stress and go do that job under stress and heat and all kind of dangerous environments. I felt like it was important that you be physically fit. The only way we could know you're physically fit to was to have some measure of whether you were fit or not, and so we -- I decided that we should have a job task."

(EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 56.)

48.    Chief Hill was aware that other Fire Departments were using similar tests and thought the Homewood Fire Department would be better served by having such a test. (EFC Doc 32-2, Ex. B, Chief Hill Depo p. 58.)

49.    The minutes of the August 26, 2020 Staff Meeting reflect discussions about the implementation of the job task test. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 63); (*see also*, EFC Doc 32-5, Ex. E, August 26, 2020 Staff Meeting Minutes.)

50.    The test selected mirrored the joint wellness fitness initiative by the International Association of Fire Chiefs and the International Firefighters Association. (EFC Doc 32-2, Ex. B, Chief Hill Depo. pp. 69-70); *(see also*, EFC Doc 32-6, Ex. F, Annual Job Task.)

51.    The Annual Job Task includes the following tasks:

"Q. Okay. And what does it say that the firefighter or the employee -- or the  member of the Homewood Fire Department is to do, 1 through 9?

A. Yeah, these nine tasks.

Q. And what are they?

A. Crawl over top of eight-foot section of simulated rafters, stand then walk to next event. Pick up dead blow hammer, drive the Keiser sled all the way to the other end. Unroll then – unroll then roll 50-foot section of three-inch fire hose. Hoist the weight attached to top rope three times to top of a third Connex box height. Must be done hand over hand up and down, cannot let rope slide through hands. Carry the 50-foot – carry the 50-foot -- I guess should be section of two-and-half-inch hose bundle either on your shoulder or over your -- or over your bottle -- over your bottle. Climb to the top of the training tower and back down. Drag a large tire truck attached to a section of two-and-a-half-inch hose a total of 75 feet on concrete. Carry steel -- carry two steel SCBA bottles filled with sand through a 50-foot long serpentine course. Crawl through a 36-inch 20-foot long plastic pipe. SCBA can be doffed and pushed ahead as long as it's controlled. Carry roof ladder and stand up against training center 25 feet and set it back against the building."

(EFC Doc 32-1, Ex. A, Capt. Webb Depo. pp. 40-41); (ECF Doc. 32-6, Ex. F, Annual Job Task.)

52.    On February 26, 2021, Chief Hill sent an email telling the firefighters of the Homewood Fire Department that the Annual Job Task would be conducted in late April and early May 2021. (EFC Doc 32-2, Ex. B, Chief Hill Depo. pp. 84-85); (ECF Doc. 32-7, Ex. G, February 26, 2021 email.)

53.    In addition to the Annual Job Task scheduled for April/May 2021, firefighters take yearly physicals. (ECF Doc. 32-2, Ex. B, Chief Hill Depo. p. 98.)

54.    It had been the practice for many years that annual physicals are conducted in March and April. (EFC Doc 32-2, Ex. B, Chief Hill Depo. pp. 105- 106.)

55.    The physicals were started by Chief Bresnan in 1996. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 57.)

56.    Captain Webb suffered from a litany of health problems. (EFC Doc 32-2, Ex. B, Chief Hill Depo. pp. 33-34.)

57.    He has been on medication for high blood pressure, cholesterol, and blood thinner for many years. (EFC Doc 32-1, Ex. A, Capt. Webb Depo. pp. 9-12.)

58.    Captain Webb also has atrial fibrillation (AFib), heart disease, and uses a CPAP. (EFC Doc 32-1, Ex. A, Capt. Webb Depo. pp. 21-22.)

59.    Captain Webb also had an IVC filter for blood clots installed in 2014, and had blood clots removed in 2014. (EFC Doc 32-1, Ex. A, Capt. Webb Depo. pp. 23-25.)

60.    Captain Webb had benign polyps removed after a colonoscopy. (EFC Doc 32-1, Ex. A, Capt. Webb Depo. p. 34.)

61.    Captain Webb admitted that he did not tell the doctors of these problems during the annual physicals. (EFC Doc 32-1, Ex. A, Capt. Webb Depo. pp. 26-29.)

62.    In early 2021, Captain Webb was diagnosed with COVID. (ECF Doc 32-1, Ex. A, Capt. Webb Depo. p. 54.)

63.    On February 5, 2021, Captain Webb was admitted to the hospital with difficulty breathing and "severe respiratory distress." (EFC Doc 32-1, Ex. A, Capt. Webb Depo. pp. 17-20.)

64.    According to Captain Webb, under Homewood's return to work rules:

"You're required to contact your supervisor to let them know you're coming back to work. You bring a doctor's excuse from your doctor. And once you get that excuse, then you're given a fit-for-duty physical."

(EFC Doc 32-1, Ex. A, Capt. Webb Depo. p. 53.)

65.    Captain Webb was cleared to return to work by his personal physician, Dr. David Wynne, on or about February 23, 2021. (EFC Doc 32-1, Ex. A, Capt. Webb Depo. pp. 182-183.)

66.    In accordance with the return to work policy, Captain Webb then saw Dr. Louise Lott for the fit-for-duty exam. (EFC Doc 32-1, Ex. A, Capt. Webb Depo. pp. 183-185.)

67.    Captain Webb was cleared to return to work. (EFC Doc 32-1, Ex. A, Capt. Webb Depo. p. 184.)

68.    Captain Webb returned to work the last week of February 2021. (EFC Doc 32-1, Ex. A, Capt. Webb Depo. p. 170.)

69.    On February 26, 2021, Chief Hill sent an email saying that the Annual Job Task would be performed between April 26 to May 1. (EFC Doc 32-2, Ex. B, Chief Hill Depo. pp. 84-85.) (ECF Doc 32-7, Ex. G, February 26, 2021 email.)

70.    Everyone in the Department, regardless of rank or duties, was required to undergo the Annual Job Task. (EFC Doc 32-2, Ex. B, Chief Hill Depo. pp. 86-89.)

71.    As previously noted, and as recognized by Captain Webb, the annual fitness exams for Homewood are given in March or April of every year. (EFC Doc 32-1, Ex. A, Capt. Webb Depo. pp. 185-186.). (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 106.)

72.    Battalion Chief Swindle told Captain Webb in March to have a physical. (EFC Doc 32-1, Ex. A, Capt. Webb Depo. p. 188.)

73.    Captain Webb acknowledges that the return to work exam and the annual physical exam are separate and independent. (EFC Doc 32-1, Ex. A, Capt. Webb Depo. p. 68.)

74.    Despite acknowledging the annual physical exam are separate and independent, Captain Webb thought it was "highly unusual that he would have to take two physicals within a period of time once you come back to work and you're given a fit-for-duty physical." (EFC Doc 32-1, Ex. A, Capt. Webb Depo. p. 52.)

75.    Captain Webb cannot say there was anything discriminatory about the March 23, 2021 physical. (EFC Doc 32-1, Ex. A, Capt. Webb Depo. p. 49.)

76.    On March 23, 2021, Captain Webb saw Dr. Thuss for the annual physical. (EFC Doc 32-1, Ex. A, Capt. Webb Depo. pp. 46-48.)

77.     Without Dr. Thuss's knowledge, Captain Webb recorded his visit with Dr. Thuss. (EFC Doc 32-8, Ex. H, Transcript of Recording of Thuss and Captain Webb.) (ECF Doc 32-9, Ex. I, Recording of Thuss and Captain Webb.)

78.     In the exam, Captain Webb continually questioned why he had to take another exam, despite the fact he has acknowledged it is Homewood policy to take an annual physical in March or April. (EFC Doc 32-8, Ex. H, Transcript of Recording of Thuss and Captain Webb.) (ECF Doc 32-9, Ex. I, Recording of Thuss and Captain Webb.)

79.     On March 28, 2021, shortly after the exam with Dr. Thuss, Captain Webb filed an EEOC Charge. (ECF Doc 32-1, Ex. A, Capt. Webb Depo. p. 167.) (EFC Doc 32-10, Ex. J, EEOC Charge.)

80.     The EEOC Charge alleged that Homewood had a history of "weeding out" black applicants, although he admits he himself had not been weeded out. (EFC Doc 32-1, Ex. A, Capt. Webb Depo. pp. 116-117.) (EFC Doc 32-10, Ex. J, EEOC Charge.)

81.     Captain Webb's EEOC Charge also complained about the length of time it took to get promoted. (EFC Doc 32-10, Ex. J, EEOC Charge.)

82.     Captain Webb first reached out to the EEOC in November or December of 2020. (EFC Doc 32-1, Ex. A, Capt. Webb Depo. pp. 167-168.)

83.     Captain Webb told four people he was thinking about filing a charge, but does not know if they told anyone. (EFC Doc 32-1, Ex. A, Capt. Webb Depo. p. 168.)

84.     Chief Hill learned of Captain Webb's EEOC Charge via e-mail on April 6, 2021. (EFC Doc 32-2, Ex. B, Chief Hill Depo. pp. 38-40.)

85.     Chief Hill was sent the email by the Homewood Chief of Staff. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 40.)

86.    Chief Hill discussed Webb's EEOC Charge with Deputy Chief Broadhead. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 43.)

87.    Also on April 6, 2021, Chief Hill sent an e-mail to the members of the Homewood Fire Department about the Annual Job Task. (EFC Doc 32-2, Ex. B, Chief Hill Depo. pp. 90-91) (EFC Doc 32-11, Ex. K, April 6, 2021 email.)

88.    The April 6, 2021 e-mail stated:

> "Our goal is 100 percent success rate. The job task is not intended to be punitive, rather, is to ensure that everyone can meet the minimum requirements for firefighting. Should a firefighter not complete the job task as designed, they will be reassigned to fire administration for remedial job training."

 (EFC Doc 32-11, Ex. K, April 6, 2021 email.)

89.    The  reassignment of a firefighter who did not complete the task would be for 90 days, then he or she could retest. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 93.)

90.    The "minimum requirements for firefighting" referenced essentially mirror the Alabama Fire College minimum qualifications course, which is mentioned in the February 26, 2021 correspondence. (EFC Doc 32-2, Ex. B, Chief Hill Depo. pp. 95-96.)

91.    After Captain Webb returned to work in late February until April 21, 2021, he went on thirty-five to forty calls. (EFC Doc 32-1, Ex. A, Capt. Webb Depo. pp. 172-175.)

92.    Captain Webb said he suffered no physical difficulties between February 2021 and April 2021. (EFC Doc 32-1, Ex. A,  Capt. Webb Depo. pp. 172-175.)

93.    Captain Webb would tell Captain Webb crew that he would operate the panel instead of actively fighting the fires. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 121.)

94.     On April 21 or 22, Chief Hill received a letter from Dr. Thuss about Captain Webb's annual physical exam. (EFC Doc 32-2, Ex. B, Chief Hill Depo. pp. 123-124.) (ECF Doc 32-12, Ex. L, Letter from Dr. Thuss.)

95.     When Dr. Thuss examined Captain Webb on March 23, 2021, Dr. Thuss was generally aware of the requirements of the Annual Job Task. (EFC Doc 32-13, Ex. M, Dr. Thuss Depo. p. 45.)

96.     Specifically, Dr. Thuss recalled:

"A. There would have been several components, but they would be in full fire gear with a double tank air tank, and they would -- I won't have them in order, I don't know the order they go into, but I know several of the stations would be -- one would be crawling through a pipe. I believe it's a twenty-inch pipe, but I could be wrong on that. But crawling through a pipe, allowing them to push their tanks in front of them as long as they stay connected, only because some people are going to be too big to get through that tank easily -- through that pipe easily.

They would raise a fire hose using a pulley system, and I believe they take it up to about three floors, three stories high. I'm not sure how many times they have to repeat that. They would carry a hose, again in full gear, up three flights of stairs, and, I, again, don't know how many times they would have to repeat that. And there's a sledge where they have to use a large sledgehammer to  pound a piece of metal, and it has to move a certain amount of spaces -- or distance before  they can call that one complete.

Oh, they have to drag a dummy that I don't know the weight, I think it used to be a hundred and fifty pounds, I'm not sure if it's still that, that they would have to drag as if it was an unconscious person. Those are some of the things I remember. I'm not sure if they have to use a fire hose or not during that, or other physical attributes they have to demonstrate."

(EFC Doc 32-13, Ex. M, Dr. Thuss Depo. p. 46.)

97.     Dr. Thuss examined Captain Webb and reviewed prior tests. He concluded that **"in my medical opinion before he undergoes the new additional strength and endurance physical**

**testing that he should be evaluated by both cardiology as well as pulmonary specialists for clearance."** (EFC Doc 32-12, Ex. L, Dr. Thuss letter).

98.     In his deposition, Dr. Thuss stressed that he recommended that additional testing be performed "**before, not after, before he undergoes the new, additional strength and endurance physical testing.**" (EFC Doc 32-13, Ex. M, Dr. Thuss Depo. p. 94).

99.     Dr. Thuss noted a decline in FEF25-75 function based in the spirometry tests which could be an indication of COPD. (EFC Doc 32-13, Ex. M, Dr. Thuss Depo. pp. 61-62.)

100.     The EKG was "borderline," but because of the limitations of the test, Dr. Thuss thought that other tests would be needed to confirm (EFC Doc 32-13, Ex. M, Dr. Thuss Depo. pp. 64-65.)

101.     Dr. Thuss did not necessarily see anything suggesting Captain Webb could not be a firefighter; rather his main concern was using the breathing apparatus. (EFC Doc. 32-13, Ex. M, Dr. Thuss Depo. p. 70.

102.     Dr. Thuss' concern was with Captain Webb performing the annual job test to confirm physical fitness. (EFC Doc 32-13, Ex. M, Dr. Thus Depo. pp. 70-71.)

103.     Based on Dr. Thuss's letter, Chief Hill had concerns about whether Captain Webb could perform the Annual Job Task test. (EFC Doc 32-2, Ex. B Chief Hill Depo. p 143.)

104.     After Chief Hill received the letter from Dr. Thuss, Chief Hill and Chief Swindle met with Captain Webb (EFC Doc 32-2, Ex. B, Chief Hill Depo. pp. 135-13), a conversation recorded with everyone's knowledge. (ECF Doc 32-14, Ex. N, Transcript of Captain Webb, Hill, Swindle Recorded Meeting.) (ECF Doc 32-15, Ex. O, Recording of Conversation between Webb, Hill and Swindle.)

105.    Chief Hill told Captain Webb that based on Dr. Thuss's concerns, Captain Webb would have to take some more tests before he could take the Annual Job Task test. (EFC Doc 32-2, Ex. B, Chief Hill Depo. pp. 135-137.)

106.    Chief Hill said at the meeting that he was concerned for Captain Webb's health:

> "So that's basically it. I can't let you do the job task until you get cleared by Dr. Thuss. Because the last thing I want is to cause somebody to have a heart attack or even get -- you know, possibly pass away because they're doing the job task and they're not physically able. And without him giving you a letter of clearance saying you're physically able, I would be remiss to let you do it. And I'm not comfortable letting you do it until your doctor -- (inaudible) --pulmonary capabilities are good enough and your cardiac capabilities are good enough and that Dr. Thuss will sign off on it to say that it's good enough."

(EFC Doc 32-14, Ex. N, Transcript of Captain Webb, Hill, Swindle Recorded Meeting, pp. 7-8.)

(EFC Doc 32-15, Ex. O, Recorded Meeting of Captain Webb, Hill, Swindle.)

107.    Chief Hill reiterated this concern later in the discussion:

> "I can't risk you getting killed on the – on the job task, and if you can't do the job task, I can't let you ride the fire truck because that means that you've not met the minimum requirements of a firefighter."

(EFC Doc 32-14, Ex. N, Transcript of Captain Webb, Hill, Swindle Recorded Meeting, pp. 15-16.) (EFC Doc 32-15, Ex. O, Recorded Meeting of Captain Webb, Hill, Swindle.)

108.    Chief Hill asked Captain Webb if he could perform the job task test, and he said no:

> "CHIEF NICK HILL: . . . But let me ask you this since we're being -- since -- what did you -- do you think you can do the job task? If you went right now and you go put on an air pack or next week?
>
> DEMETRIUS WEBB: I've struggled with it.
>
> CHIEF NICK HILL: But do you think you could do it?

DEMETRIUS WEBB: No.

CHIEF NICK HILL: But you don't think honestly you can put on an air pack and make two laps even with two air packs?

DEMETRIUS WEBB: I'm not -- I'm not sure.

CHIEF NICK HILL: Do you think that your health is good enough to risk it?

DEMETRIUS WEBB: I don't know."

(ECF Doc 32-14, Ex. N,  Transcript of Captain Webb, Hill, Swindle Recorded Meeting, pp. 25-26.) (EFC Doc 32-15, Ex. O, Recorded Meeting of Captain Webb, Hill, Swindle.) (EFC Doc 32-2, Ex. B, Chief Hill Depo. pp. 136, 144.)

109.    Because of the concerns about Captain Webb's health, Chief Hill placed Captain Webb on limited duty and assigned Captain Webb to administration. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 147.)

110.    The recording of the meeting between Chief Hill, Captain Webb and Battalion Chief Swindle reflects that Chief Hill gave Captain Webb a great deal of flexibility in deciding what schedule he would like with the new duties and offered to help in any way needed with physical training to "get you back to where you want to be." (EFC Doc 32-14, Ex. N, Transcript of Captain Webb, Hill, Swindle Recorded Meeting, pp. 32-35.) (EFC Doc 32-15, Ex. O, Recorded Meeting of Captain Webb, Hill, Swindle.)

111.    Rather than take additional physical tests to be cleared or go to an administrative task, Captain Webb decided to retire. (EFC Doc 32-1, Ex. A, Capt. Webb Depo. p. 210.)

112.    Captain Webb testified that he had no plans to retire soon. (EFC Doc 32-1, Ex. A, Capt. Webb Depo. pp. 210-211.)

113.    However, in the recording Captain Webb made at Dr. Thuss's office on March 23, 2021, when talking to someone who said they had retired, Captain Webb said, twice, "I'm fixing to do the same thing." (EFC Doc 32-8, Ex. H, Transcript of Recording of Thuss and Captain Webb, p. 36.) (EFC Doc 32-9, Ex. I, Recording of Thuss and Captain Webb.)

## III.    STANDARD OF REVIEW

Captain Webb has the burden of proof at trial. He must meet the standard explained in *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. To defeat summary judgment, Captain Webb must have "significant probative evidence tending to support the complaint." *Morris v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986). Summary judgment is appropriate because Captain Webb cannot satisfy his evidentiary burden.

Summary judgment should be granted also because no genuine issue of material fact exists. *Celotex*, 477 U.S. at 323. According to the Supreme Court of the United States:

> [The summary judgment] standard provides that the mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine [dispute] of material fact. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986)

## IV.    POINTS AND AUTHORITIES.

A.    <u>The "failure to promote" claim fails.</u>

Captain Webb's race-based failure-to-promote claim has four elements: (1) he is a member of a protected group; (2) he applied for, and was qualified to fill, a position for which the defendant was accepting applications; (3) despite her qualifications, the plaintiff was rejected for the position; and (4) after his rejection, the employer *either* kept the position open, *or* filled it with a person outside his protected class. *Walker v. Mortham*, 158 F.3d 1177, 1179 n.2 (11th Cir. 1998).

"If a plaintiff makes the requisite showing, the burden of production . . . shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. . . . . The employer 'need not persuade the court that it was actually motivated by the proffered reasons.' . . . Rather, if the employer 'articulat[es] one or more reasons, then the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." *Brown v. Alabama Dept. of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010).

Here, as the facts show, Homewood had many legitimate, nondiscriminatory reasons for promoting both Captain Everson and Lt. Broadhead to the position of Battalion Chief. The evidence establishes:

- Captain Webb had a low score on the matrix Chief Hill developed—an objective method of recording the applicant's relevant qualifications, training, and experience level.

- Captain Webb was an EMT, not a paramedic, which is the highest level for a first responder rendering emergency medical care. Because more than 60% of calls involved medical issues, Homewood has ***never*** had a Battalion Chief that was not a paramedic.

- Captain Everson and Lt. Broadhead had unique qualifications. Captain Everson was already on the "B shift" and was second in command of the AMAS team. Again, Captain Webb was NOT a paramedic.

- Lt. Broadhead had experience in the type of administration required for the Battalion Chief position. Lt. Broadhead had a bachelor's degree, had almost

completed a master's degree, and he is a paramedic. (ECF Doc ____, Declaration of Chief Broadhead.)

With these facts, the burden shifts to Captain Webb to prove pretext, a burden he cannot meet.

> In the context of a promotion, a plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the [person] who received the position he coveted. A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by race.

*Springer v. Convergys Customer Mgmt. Group Inc.*, 509 F. 3d 1344, 1348 (11th Cir. 2007).

To rebut Homewood's reasons for promoting others than him, Captain Webb "must show that the disparities between the successful applicant's and his own qualifications were 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'" *Id.* (citations omitted).

Again, Captain Webb cannot meet this burden. The only fact Captain Webb can point to that would make him "more" qualified was that he had more years of service. But even Captain Webb admitted that years of service do not necessarily make someone the best candidate. (EFC Doc 32-1, Ex. A, Capt. Webb Depo. p. 85.) As Captain Webb himself said, "It's no one set goal or one set thing." (EFC Doc 32-1, Ex. A, Capt. Webb Depo. p. 86.)

It cannot be said that the decision to promote Everson and Broadhead was such "that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." *Springer,* 509 F. 3d at 1348. Indeed, in the failure-to-promote context, a plaintiff cannot demonstrate pretext by simply showing that he was better qualified than the individual who received the position that he wanted unless the disparities in their qualifications are so apparent as "virtually to jump off the page and slap you in the face." *Denney v. City of Albany*, 247 F.3d 1172, 1187 (11th Cir. 2001). Such is not the case here.

Finally, while Captain Webb "has testified that he felt discriminated against, his opinion, without more, is not enough to establish a prima facie case of race discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997).

It is true that Captain Everson struggled in the position and was demoted seventeen months later. (ECF Doc 32-2, Ex. B, Chief Hill Depo. p. 214.) However, Courts do not "second-guess the wisdom of an employer's business decisions . . . as long as those decisions were not made with a[n] [unlawful] motive. That is true . . . no matter how mistaken the firm's managers." *Langston v. Lookout Mt. Cmty. Servs.*, 775 Fed. Appx. 991, 1001 (11th Cir. 2019), quoting *Alvarez v. Royal Atlantic Developers, Inc*., 610 F.3d 1253, 1266 (11th Cir. 2010).

Captain Webb cannot rebut the legitimate reasons that Captain Everson and Lt. Broadhead were named Battalion Chief. The City of Homewood is entitled to summary judgment.

Nor can Captain Webb prevail under a "mixed motive" theory. Under the "mixed motive" analysis, the plaintiff must show "1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was a motivating factor for the defendant's adverse employment  action." *Quigg v. Thomas Cnty. Sch. Dist*., 814 F.3d 1227, 1232-1233 (11th Cir. 2016).

"A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "A 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . ., and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically

better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019).

Here, the only "evidence" of discrimination is Captain Webb's reliance on unproven, anecdotal statistics showing the number of African-American firefighters hired by Homewood. Importantly, however, "a plaintiff cannot show disparate treatment by merely citing statistics. . . . Without any analytical foundation, statistical evidence is 'virtually meaningless' and cannot be probative of pretext. . . . Indeed, while discriminatory-looking statistics may satisfy a plaintiff's prima facie burden, they do not support an inference of intentional [race] discrimination if the data can be explained in a plausible, [race]-neutral fashion." *Chavez v. URS Fed. Tech. Servs.*, 504 Fed. Appx. 819, 822 (11th Cir. 2013). "Although a plaintiff may use statistics to bolster her case, these statistics are not controlling in an individual disparate treatment case, particularly if the employer can show legitimate, non-discriminatory reasons for its actions." *McKeon v. Vaicaitis, Schorr, Richards, M.D., P.A.*, 825 F. Supp. 290, 293 (MD Fla. 1993).

Moreover, Homewood can by law hire only from blind lists which do not identify race. (ECF Doc 32-2, Ex. B, Chief Hill Depo., p. 223.) These lists originate from the Personnel Board of Jefferson County. (ECF Doc 32-2, Ex. B, Chief Hill Depo., pp. 235-236.) *See also Rules and Regulations of the Personnel Board of Jefferson County* Sections 1.1 and 11.2.

Here, the statistics do not indicate any discriminatory intent. As Hill testified, the race of the applicant is not contained anywhere in the application. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 223.) Because the race of the applicant is not noted on the application, he could not track how many black applicants there were. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 223.) The Department does not know the race of the person until the person shows up for the interview. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 225.) In his time as Chief, Hill never interviewed a black

21

applicant, although he stepped out of the hiring process in mid-2021. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 224-225.)

But in addition, Homewood tries to replace employees with new employees with similar qualifications. For example, if a paramedic leaves, Homewood tries to replace that person with another paramedic. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 221-222.) Unfortunately, there simply are not a lot of qualified black paramedics on the applicant list. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 230-231.) By only hiring already qualified paramedics, Homewood saves about $30,000 in training costs. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 230-231.) Plus, not everyone who applies actually accepts an interview when offered. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 230-231.) Homewood interviews black men or women that show up for the interview.

Thus, many explanations exist for why there is a small number of African-Americans in the Homewood Fire Department. Racism is not one.

In any event, even under the "convincing mosaic" standard, Captain Webb <u>still</u> must prove that the reasons given for not promoting him were pretextual. For all the reasons stated above, Captain Webb cannot meet that burden, and Homewood is entitled to summary judgment.

B.  <u>Captain Webb's claim for retaliation against Chief Hill fails.</u>

Captain Webb alleges that after he filed an EEOC claim on March 28, 2021, Chief Hill retaliated against Captain Webb by "subjecting Plaintiff to a successive physical examination without a valid medical reason and removal of Plaintiff from active duty in April 2021." (ECF Doc. 9, ¶63.) This claim fails, both factually and legally.

Retaliation and discrimination claims brought under 42 U.SC. § 1983 and Title VII require the same proof. *Goldsmith v. Bagby Elevator Co.,* 513 F.3d 1261, 1277 (11 Cir. 2008) (addressing

retaliation claims under Section 1983 and Title VII ); *Bryant v. Jones*, 575 F.3d 1281, 1296 n. 20 (11th Cir. 2009) (addressing discrimination claims under Section 1983 and Title VII).

To establish a prima facie retaliation claim, a plaintiff must show: (1) that he engaged in statutorily protected conduct; (2) that he suffered adverse employment action; and (3) that "some causal relation" exists between the two events. *See Alvarez v. Royal Atl. Developers, Inc*., 610 F.3d 1253, 1268 (11th Cir. 2010).

Consistent with Title VII and Section1983 having the same burdens of proof, the Eleventh Circuit held that, for retaliation claims, the correct standard for causation is that the plaintiff must show that that the proffered legitimate reasons for taking the adverse action were a pretext for retaliation and that his protected activity was the "but-for" cause of the adverse action. In *Siddiqui v. NetJets Aviation, Inc*., 773 Fed.App'x 562, 566 (11th Cir. May 31, 2019), the Court stated "[a]s in the discrimination context, Section 1981 and Title VII retaliation claims are analyzed under the same framework." The court held "[u]ltimately, the employee must prove that "the desire to retaliate was the but-for cause of the challenged employment action."    Captain Webb's claims fail for many reasons.

As an initial matter,  it is important to clarify what is actually at issue. The only medical exam that is alleged to have been retaliatory was the exam Dr. Thuss recommended be taken before Captain Webb took the Annual Job Task. All other physical exams undisputedly were in accordance with policy. In February 2021, after Captain Webb was released from the hospital with COVID, he was, as required by policy, seen by his own doctor for clearance. Then, as required by policy, he was seen by another doctor for a fit-for-duty exam, also in February 2021. Then, third, Captain Webb saw Dr. Thuss for his annual physical in March 2021, as all firefighters are required

to take in March or April and have been doing so since 1996. The only exam at issue is the one Captain Webb refused.

In addition, Captain Webb alleged that he was removed from "active" duty. This alleged removal from active duty is a misnomer. Captain Webb was never removed from active duty. Chief Hill was simply going to move Captain Webb from responding to calls to an administrative role. He was still an active employee, but serving in a different capacity.

Captain Webb cannot show that either event was retaliatory.

The EEOC Charge was filed in late March, 2021. The decision to implement the Annual Job Task was made in August 2020. Likewise, the decision to hold the Annual Job Task in late April or early May was communicated in February 2021. Thus, there can be no argument that requiring Captain Webb to take the Annual Job Task was in any way retaliatory.

Instead, Captain Webb argued that Chief Hill retaliated by asking him to take follow up tests before taking the Annual Job Task. But Hill did so only based on the letter from Dr. Thuss. As a result of his review of Captain Webb's tests and his exam of Captain Webb, Dr. Thuss wrote to Hill and recommended that "in my medical opinion before he undergoes, not after, before he undergoes the new additional strength and endurance physical testing that he should be evaluated by both cardiology as well as pulmonary specialists for clearance." (EFC Doc 32-13, Ex. M, Dr. Thuss Depo. p. 94.)

There is no evidence that Dr. Thuss spoke to Chief Hill or others about this recommendation. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 127.) And there is no evidence that Dr. Thuss was aware that Captain Webb had made an EEOC charge. There is no indication that Dr. Thuss made that statement using anything other than his legitimate medical judgment.

24

Chief Hill stated that given that recommendation from Dr. Thuss, i.e., that further testing should be had before Captain Webb took the Annual Job Task, Chief Hill concluded that it would be remiss if he allowed Captain Webb to take the Annual Job Task given the risk. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 149.)

In the depositions, Captain Webb's attorney attacked Dr. Thuss's medical judgment and accused Chief Hill of second-guessing the other doctors who, prior to Dr. Thuss, cleared Captain Webb for a return to duty. But Chief Hill is not a doctor. All he can do is rely on what the doctors tell him. And the doctor who performed the annual physical recommended that further tests be performed before Captain Webb be allowed to take the Annual Job Task. With this undisputed evidence, it cannot be said that any retaliation (which there was none) was the but-for cause of asking Captain Webb to take a physical exam before undergoing the Annual Job Task.

Requiring such an exam where there are questions is not retaliatory. For example, in *Fratarcangeli v. UPS*, 2008 U.S. Dist. LEXIS 27928, 2008 WL 821946 (MD Fla. March 26, 2008), the plaintiff alleged that requiring him to undergo a functional capacity evaluation ("FCE") after an injury was retaliation for the filing of a lawsuit. The employer ultimately did not have the employee take the test, but the district court held that even if it had been required, it would not be evidence of retaliation. The district court held, "there is nothing suspect about requiring a delivery driver who regularly engages in heavy duty work to undergo a comprehensive FCE to confirm fitness for duty, instead of relying solely on a conclusory physician's note." *Fratarcangeli*, 2008 U.S. Dist. LEXIS 27928, *24. If requiring a test for a UPS driver is not suspect, then surely requiring an exam before engaging in a strenuous physical exam for a firefighter where there are questions of safety.

Indeed, "a plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason" as long as 'the reason is one that might motivate a reasonable employer.'" *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001), quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997).

Given the letter from Dr. Thuss, a reasonable employer would have done the same thing. There is no evidence of pretext, and no evidence of retaliation. Likewise, telling Captain Webb that he would be in administration pending the physical exam is not retaliatory. Captain Webb was in no way demoted. It would be a temporary assignment until he was cleared to take the Annual Job Task. He was to have the same pay and the same rank – merely a different assignment.

The result here would have applied to anyone in the Fire Department. If the Annual Job Task was not passed, then the person would be placed in an administrative position until it was passed and for further training. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 153.) **Captain Webb himself stated that he could not pass the test**. (EFC Doc 32-2, Ex. B, Chief Hill Depo. p. 135-137.) (ECF Doc 32-14, Ex. N, Transcript recording of Captain Webb, Hill, Swindle Meeting, pp. 25-26.) (ECF Doc. 32-15, Ex. O, Recording of Captain Webb, Hill Swindle Meeting.)

But again, the doctor who performed the annual physical recommended that further tests be performed before Captain Webb be allowed to take the Annual Job Task. With this undisputed evidence, it cannot be said that any retaliation (which there was none) was the but-for cause of placing Captain Webb in an office.

## V.    CONCLUSION

For the above stated reasons, Defendants are entitled to summary judgment on all claims.

Dated: May 31, 2024.

Respectfully submitted,

*/s/ Wayne Morse*
Wayne Morse
Michael G. Kendrick
Attorneys for Defendant
City of Homewood

WALDREP STEWART &
 KENDRICK LLP
2850 19th Street South
Suite 370
Homewood, Alabama 35209
Telephone:(205) 254-3216
Facsimile: (205) 324-3802
Email: morse@wskllp.com
Email: kendrick@wskllp.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on all counsel of record on May 31, 2024 by CM/ECF electronic filing which will send notification to the following:

Artur Davis
2024 3rd Ave. North, Suite 212
Birmingham, AL 35203
Direct: 205-881-0935
adavis@hkm.com

*/s/ Wayne Morse*
Of Counsel