FILED
2024 Jun-24  AM 08:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **DEMETRIUS WEBB,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No:** |
| v. | ) | **2:23-cv-01098-RDP** |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **CITY OF HOMEWOOD,** | ) | **MOTION FOR ORAL ARGUMENT** |
| **ALABAMA, CHIEF NICHOLAS HILL** | ) | |
| **in His Individual Capacity,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>PLAINTIFF'S MEMORANDUM BRIEF IN OPPOSITION TO DEFENDANTS'</u>

## <u>MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff **Demetrius Webb** files this Memorandum Brief in Opposition to the Motion for Summary Judgment filed by Defendants **City of Homewood, Alabama** and **Chief Nicholas Hill, in his individual capacity** (collectively, "Defendants") (Doc. 33), based on the following factual allegations and authorities:

**TABLE OF CONTENTS**

I.      RESPONSE TO DEFENDANT'S STATEMENT OF FACTS............3

        A.      Facts relevant to the failure to promote claim.....................3

II.     PLAINTIFF'S ADDITIONAL UNDISPUTED FACTS...................3

        A.      Undisputed facts relevant to the failure to promote claim.........3

        B.      Undisputed facts relevant to the retaliation claim.................6

                1.      The implementation of HFD's job task test................6

                2.      Chief Hill's adoption of stricter job task policies on the

                        day he learns of Webb's EEOC charge............................8

                3.      Webb's medical condition in March and April 2021......8

                4.      Hill's removal of Webb from active duty status.........   10

III.    PLAINTIFF'S ADDITIONAL DISPUTED FACTS.....................12

IV.     LEGAL ARGUMENT AND CITATIONS OF AUTHORITY............12

        A.      Legal standard on summary judgment.............................12

        B.      Title VII failure to promote claim....................................13

        C.      The retaliation claim against Chief Hill............................19

V.      CONCLUSION.....…………………………………………………26

I.      **RESPONSE TO DEFENDANTS' STATEMENT OF FACTS**

A.      **Facts relevant to the failure to promote claim**

28.      Disputed: Of the two Battalion Chief openings in the fall of 2020, David Everson was selected for the second opening. (Doc. 32-2, Ex. B, Deposition of Chief Nicholas Hill ("Hill depo.") at 189).[1]

108.      Disputed: A review of the transcript of the referenced meeting does not clearly establish that Webb indicated an inability to take the job fitness examination, and indicates that Webb referred only to his doubt that he could pass one aspect of the exam, putting on an air pack or running laps with the air pack. (Doc. 32-14, Ex. N, Transcript of Webb, Swindle, Hill Meeting at 25-26).

II.      **PLAINTIFF'S STATEMENT OF ADDITIONAL UNDISPUTED FACTS**

A.      **Undisputed facts relevant to the failure to promote claim**

1.      The Homewood Fire Department ("HFD") hires and promotes few African-Americans: as of January 2024, there were three Black firefighters out of 75, and during his tenure, Chief Nicholas Hill ("Hill" or "Chief Hill") hired one Black candidate out of 35-40 total hires (Doc. 32-2, Hill depo. at 217, 221); Webb and Hill believe that from 2013 to 2021, the last 40 firefighters hired were white. (Doc. 32-1, Ex. A, Deposition of Demetrius Webb ("Webb depo.") at 158-59; Hill depo. at 225-26); in addition, in the 21 years it took Webb to be promoted, 15-20 white officers were promoted (Doc. 32-1, Webb depo. at 163-64).

2.      In September and October 2020, there were two open slots for the upper-level leadership role of Battalion Chief. (Doc. 32-2, Hill depo. at 186).

3.      Chief Hill made the decision to evaluate the same candidates for both positions rather than create a separate applicant pool for each. (Doc. 32-2, Hill depo. at 187-88).

---

[1] Plaintiff employs a similar citation format to Defendants, who cite only the page number for deposition transcripts.

4.      Captain Demetrius Webb ("Webb"), who is Black, was considered for both Battalion Chief slots in the fall of 2020. (Doc. 32-2, Hill depo. at 187).

5.      Hill conducted interviews with the candidates, but he acknowledges that the interviews were not a factor in the selection process. (Doc. 32-2, Hill depo. at 196).

6.      In addition to the assessment matrix Hill relied on to evaluate candidates for Battalion Chief, their respective resumes were a secondary factor. (Doc. 32-2, Hill depo. at 196).

7.      Regarding the first Battalion Chief opening, Hill selected a white candidate, Brandon Broadhead, who had a lower rank, lieutenant, and had served for a considerably shorter time at HFD than Webb—13 years as opposed to 35 years. (Doc. 32-2, Hill depo. at 197-98).

8.      Two of the ostensible characteristics Hill identified as grounds for jumping Broadhead past Webb—Broadhead's experience in developing HFD's budget and his skill in fielding civilian complaints—were a function of the prior Chief providing Broadhead access to department-wide administrative roles that was not provided to the higher-ranking Webb. (Doc. 32-2, Hill depo. at 203-05).

9.      Broadhead lacked practical managerial experience that Webb possessed, in that Webb had held senior leadership roles in two unit stations, while Broadhead never held such a position. (Doc. 32-2, Hill depo. at 247, Declaration of Demetrius Webb, Doc. 37-1, Ex. A, ("Webb dec.") at ¶¶ 12-13).

10.     During his tenure, Webb served as head of maintenance at Fire Station 1, which is the station where most of the firefighters work because it has two apparatus [fire trucks] and the [B]attalion [C]hiefs's car, so it has 11 or 12 people there, so it's a big station. It has a lot of maintenance issues because it's big." (Doc. 32-2, Hill depo. at 244-45; Doc. 37-1, Webb dec. at ¶ 12).

11.    At another point, Webb acted as station captain at Fire Station 3; in that role, Webb managed all operational activities, including maintenance, payroll preparation, and acquisition of equipment and vehicles. (Doc. 37-1, Webb dec. at ¶ 13).

12.    Webb also served in the rotation of captains who filled in as relief Battalion Chiefs in their division when the incumbent was absent or on a leave day. (Doc. 37-1, Webb dec. at ¶ 6.)

13.    Because of HFD's leave policies, Battalion Chiefs were permitted a day off every 13th day, meaning that Webb regularly performed the full responsibilities of the relief Battalion Chief, by his estimate, as many as 20 times. (Doc. 37-1, Webb dec. at ¶¶ 7-8).

14.    Because the roster of acting Battalion Chief is reserved for officers who had served as Captain, Broadhead inevitably had none of the experience actually performing as Battalion Chief that Webb exercised on a regular basis. (Doc. 37-1, Webb dec. at ¶ 6).

15.    Because he was on the acting Battalion Chiefs roster, Webb routinely participated in executive-level briefings with HFD's top command. (Doc. 37-1, Webb dec. at ¶ 11).

16.    The other Battalion Chief candidate selected over Webb, a white captain named David Everson, also had less experience as an officer than Webb, and much of his experience was with a much smaller and largely rural department in McCalla. (Doc. 32-2, Hill depo. at 211-13).

17.    Hill's descriptions of Everson's strengths were vaguely stated: "Moving forward, being-taking classes, being proactive, taking on other responsibilities." (Doc. 32-2, Hill depo. at 213).

18.     While Hill testified that the major strike against promoting Webb was the fact that he never obtained paramedic credentials, there is no evidence that the posted job qualifications for the Battalion Chief's job required such a certification. (Doc. 32-2, Hill depo. at 206, 208).

19.     Hill conceded that Webb was not told that he lacked any of the qualifications necessary to be Battalion Chief or that a paramedic's certification was essential for the role. (Doc. 32-2, Hill depo. at 208; Doc. 37-1, Webb dec. at ¶ 16).

20.     In addition, Webb's lack of a paramedic's certification did not preclude him from being in the roster of acting Battalion Chiefs. (Doc. 37-1, Webb dec. at ¶ 16).

21.     Hill also claimed that Everson was selected partly because of his experience acting as second in command on the AMAS [mass casual] unit on his shift. (Doc. 32-2, Hill depo. at 209).

22.     Webb also had experience serving as a maintenance officer on the mass casualty trailer on his shift. (Doc. 32-2, Hill depo. at 243-44).

23.     Hill was unable to identify any performance issues regarding Webb when he served in leadership-level positions at HFD. (Doc. 32-2, Hill depo. at 240-41, 244-46).

24.     Everson struggled in the Battalion Chief's position to the point that he had to be demoted back to Captain. (Doc. 32-2, Hill depo. at 214).

**B.      Undisputed facts relevant to the retaliation claim**

**1.      The implementation of HFD's job task test**

25.     When Chief Hill raised the idea of a physical fitness test, which he refers to as an "annual job task," at an executive staff meeting in August 2020, Hill emphasized that with respect to his expectations for physical fitness, "We are not all at the same place physically, and I do not expect us to all start at the same place." (Doc. 32-2, Hill depo. at 66-68).

26.     Hill explained in deposition that the job task test was not meant to serve as a measure of overall agility or endurance, but as a gauge of "firefighting related skills" such as "dragging hose, climbing ladders, opening hydrants." (Doc. 32-2, Hill depo. at 69).

27.     During the August 2020 briefing, Hill did not mention any requirement that firefighters be cleared by a physician to take the job task test. (Doc. 32-2, Hill depo. at 73).

28.     Hill also did not address during the August 2020 meeting any potential consequences of a firefighter being unable to pass the agility test, including the prospect that being put on limited duty might be necessary in such a circumstance. (Doc. 32-2, Hill depo. at 72-73).

29.     As Hill proceeded to implement the job task test, he never amended HFD's standard operating procedure to reflect the test as a mandatory criterion. (Doc. 32-2, Hill depo. at 76-79).

30.     Hill acknowledges that he never sent an official notification to HFD personnel that the job task test is to be considered a part of the job description for a firefighter. (Doc. 32-2, Hill depo. at 83-84).

31.     When Hill issued a formal directive announcing the job task test on February 26, 2021, the document made no reference to reassigning firefighters who can't pass the test to administrative duties. (Doc. 32-2, Hill depo. at 92-93).

32.     As in the August 2020 senior staff briefing, the February 2021 memo makes no reference to any consequences for the inability to pass the job task test. (Doc. 32-2, Hill depo. at 97-98).

2.    **Chief Hill's adoption of stricter job task policies on the day he learns of Webb's EEOC charge**

33.    In late March 2021, Hill and then Deputy Chief Broadhead heard rumors that Webb was physically struggling at work after his return from a two-month leave for serious Covid-19 complications and had, in at least one instance, declined to enter a structure fire. (Doc. 32-2, Hill depo. at 116-17).

34.    On April 6, 2021, Hill was notified that Webb had filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Doc. 32-2, Hill depo. at 38, 90-91).

35.    Hill admitted that he was taken aback by the charge, which directly accused Hill of discriminatory conduct, and believed the claim that he had engaged in racial discrimination during the selection process for Battalion Chief was a false accusation. (Doc. 32-2, Hill depo. at 48-49).

36.    Late afternoon on the same day that Hill received notice of the EEOC charge filing, at 3:46 PM, he issued a new message to city employees about the job task test, specifying for the first time that any firefighter who could not pass the test would be reassigned to administrative duty and required to retest within 90 days. (Doc. 32-2, Hill depo. at 90-98).

3.    **Webb's medical condition in March and April 2021**

37.    After Webb recovered from Covid in February 2021, in accordance with HFD protocols for firefighters who are out for more than two weeks on medical leave, he was examined by his own doctor and an occupational health doctor contracted by HFD and cleared to return to work without any physical restrictions. (Doc. 32-2, Hill depo. at 100-02).

38.     Hill had no reason to question the conclusions by two physicians that Webb was qualified to return to work and resume his duties without limitation. (Doc. 32-2, Hill depo. at 108-13).

39.     During Dr. C.B. Thuss' examination of Webb on March 23, 2021, Webb did not manifest any signs of difficulty breathing and did not report that he was having trouble breathing at work. (Doc. 32-13, Ex. M, Deposition of Dr. C.B. Thuss ("Thuss depo.") at 42-43).

40.     Dr. Thuss saw no signs that a 2014 pulmonary embolism was having any impact on Webb in 2021. (Doc. 32-13, Thuss depo. at 44).

41.     Dr. Thuss did not know and did not ask what the specific scope of Webb's daily duties as a captain entailed. (Doc. 32-13, Thuss depo. at 48-50).

42.     Dr. Thuss did not relate to Webb during their meeting to review the physical examination that he had concerns that Webb would be at risk if he took the job task test. (Doc. 32-13, Thuss depo. at 53).

43.     Dr. Thuss did not tell Webb that he was in any imminent danger. (Doc. 32-13, Thuss depo. at 53-54).

44.     Dr. Thuss' references in his correspondence with Hill describe some EKG abnormalities that were, in fact, from a 2019 exam. (Doc. 32-13, Thuss depo. at 54, 65; Doc. 32-12, Ex. L, ("Thuss letter") at 2).

45.     Dr. Thuss did not see a clinical need to have a new EKG performed during the physical, and he did not tell Webb that he needed additional cardiovascular testing. (Doc. 32-13, Thuss depo. at 54-57, 65-66).

46.    To the extent that Dr. Thuss discussed cardiovascular issues with Webb, it would have been in the broad context of how Covid-19 can impact healthy heart functioning. (Doc. 32-13, Thuss depo. at 58).

47.    While Dr. Thuss' correspondence with Chief Hill about Webb refers to possible decline in the results of a spirometry breathing test, Dr. Thuss conceded in his deposition that there was no conclusive evidence of a genuine decline in Webb's breathing capacity. (Doc. 32-13, Thuss depo. at 61).

48.    Dr. Thuss did not believe that the difference in Webb's 2019 and 2021 spirometry results was symptomatic of chronic health issues. (Doc. 32-13, Thuss depo. at 62-63).

49.    Webb appeared to have normal lung functioning during his physical examination. (Doc. 32-13, Thuss depo. at 63).

50.    Dr. Thuss did not tell Webb that the spirometry measurements were any sort of red flag about his ability to perform his job. (Doc. 32-13, Thuss depo. at 71).

51.    Had Dr. Thuss seen any indications from the physical exam that Webb could not perform his daily job functions, he would have alerted him. (Doc. 32-13, Thuss depo. at 72).

52.    Dr. Thuss acknowledged that he could not determine that Webb would have been endangered by taking the job task test. (Doc. 32-13, Thuss depo. at 91).

**4.    Hill's removal of Webb from active duty status**

53.    No firefighter other than Webb has been prevented from taking the job task test since it was instituted in 2021. (Doc. 32-2, Hill depo. at 156).

54.    Other than Webb, no firefighter has been directed to receive additional medical testing or examination since the job task test was put in place. (Doc. 32-2, Hill depo. at 156).

55.     Hill did not consider seeking an additional medical opinion as to whether Webb was able to safely take the job task test. (Doc. 32-2, Hill depo. at 164).

56.     Hill also did not offer Webb any reassurance that he would continue in the role of Captain while he was on limited duty status. (Doc. 32-2, Hill depo. at 155).

57.     At no point in his meeting with Hill and Broadhead did Webb discuss any intention of retiring or convey that he could not perform any aspect of his job. (Doc. 32-14, Transcript of Webb, Swindle, Hill meeting at 1-17).

58.     Nothing in Dr. Thuss' correspondence indicates that Webb could not perform any aspect of his job. (Doc. 32-12, Thuss letter at 1-3).

59.     When Hill heard rumors that on at least one occasion, Webb did not enter a structure fire after his return from leave, Hill indicated he had no concerns and took no steps to investigate. (Doc. 32-2, Hill depo. at 117).

60.     Webb is not the only firefighter at HFD to allege retaliatory conduct under Hill's leadership: Tony Franklin filed a charge of retaliation with the EEOC on September 5, 2023. (Doc. 37-2, Ex. B, EEOC Charge of Tony Franklin ("Franklin EEOC charge")).

61.     On June 20, 2023, Franklin emailed a message to the senior leadership at HFD, as well as the Mayor and his top aide, saying that he believed HFD had a pattern of only elevating white men to senior leadership roles. (Doc. 37-2, Franklin EEOC charge at 3).

62.     Franklin contends that soon after he sent his complaint, another officer told him that "there are three people who run this department, and you better not f*** with any of them." (Doc. 37-2, Franklin EEOC charge at 3).

63.    Franklin further alleges that his lieutenant further advised that he had been instructed by "the highest levels of HFD to start building a disciplinary paper trail of every possible infraction he can find on [Franklin]." (Doc. 37-2, Franklin EEOC charge at 3).

## III.    PLAINTIFF'S ADDITIONAL DISPUTED FACTS

64.    Franklin contends that within a week of his June 30, 2023 email, he was warned by a senior officer that Chief Hill and then Deputy Chief Broadhead made comments that "going forward, [Franklin] needs to be very careful." (Doc. 37-2, Franklin EEOC charge at 1). Homewood disputes this claim in its position statement to the EEOC filed on October 16, 2023. (Doc. 37-3, Ex. C, Homewood EEOC Response to Position Statement ("Homewood EEOC response") at 4).

65.    Franklin claims that he was subjected to unwarranted disciplinary write-ups; that he stopped receiving extra work assignments on other shifts, which Franklin says senior firefighters rely on to earn more income; and that he was assigned to another station partly to separate him from another Black officer whom HFD feared might file a lawsuit. (Doc. 37-2, Franklin EEOC charge at 3). Homewood disputes this claim in its position statement to the EEOC. ( Doc. 37-3, Homewood EEOC response at 6).

## IV.    LEGAL ARGUMENT AND CITATIONS OF AUTHORITY

### A.    Legal standard on summary judgment

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pr. 56(a). A movant is entitled to judgment as a matter of law only when "the facts and inferences point so overwhelmingly in favor of one party that reasonable people could not arrive at a contrary verdict." *Brown v. Alabama Department of Transportation*, 597 F.3d 1160, 1173 (11th

Cir. 2010). All evidence and reasonable inferences must be drawn in the non-movant's favor. *Alvarez v. Royal Atlantic Devs. Inc.*, 610 F.3d 1253, 1263-64 (11th Cir. 2010).

**B.     Title VII failure to promote claim**

As a general principle, claims that an employer's promotional decision was discriminatory are governed by the familiar *McDonnell Douglas*[2] burden-shifting formula. An employee is obligated to first establish a prima facie case of liability consisting of proof that he "(1) belonged to a protected class; (2) was qualified for and applied for a position that the employer was seeking to fill; (3) was rejected despite his qualifications; and (4) that the position was filled with an individual outside the protected class." *Anthony v. Georgia,* 69 F.4th 796, 807 (11th Cir. 2023). It remains an unresolved question whether an employee must show at the prima facie stage that the promoted individual was equally or less qualified. *See Guerriero v. City of Delray Beach*, 2024 WL 2291686 at *3, n.3 (11th Cir. May 21, 2024).

Should the plaintiff demonstrate a prima facie case, the burden shifts to the defendant to establish that the promotion was for legitimate, nondiscriminatory reasons; if that showing is made, it is up to the plaintiff to establish a triable issue as to whether the employer's purported reasons are in fact pretextual. *Id*. The bar is ordinarily a high one for plaintiffs seeking to challenge a promotion decision, in that they "must show that the disparities between the successful applicant's and [their] own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." *Brooks v. County Commission of Jefferson County*, 446 F.3d 1160, 1163 (11th Cir. 2006).

But Webb's failure to promote claim is a different story. In Count I of the operative Complaint, he clearly relies on the motivating factor provision of Title VII, 42 U.S.C.A. §

---

[2] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

2000e-2(m). (Doc. 26 at 13, ¶ 59). Claims under this provision, often referred to as

"mixed-motive claims," need only demonstrate that an impermissible factor like race "was a

motivating factor" for the defendant's conduct, "even though other factors also motivated the

practice." *Id.* The mixed-motive litigant is only required to show that illegal bias "contributed in

some way to the outcome—even if it ultimately changed nothing." *See Yelling v. St. Vincent's

Health System*, 82 F.4th 1329, 1339 (11th Cir. 2023); *Quigg v. Thomas County School District*,

814 F.3d 1227, 1235 (11th Cir. 2016).

Mixed-motive claims <u>are not governed</u> by the more demanding *McDonnell Douglas*

framework. *Id.* at 1239. Therefore, given the more permissive standard, a plaintiff asserting

mixed-motive discrimination is required to establish the equivalent of the mosaic test that

operates as the Eleventh Circuit's alternative to summary judgment. *Id.* at 1240. That means, in

order to survive summary judgment, a plaintiff may offer sufficient "circumstantial evidence that

creates a triable issue concerning the employer's discriminatory intent." *Id.*  Such a showing can

be met, this circuit has determined, by an array of factors that woven together illustrate

discriminatory bias was at work, including: "(1) suspicious timing, ambiguous statement…and

other bits and pieces from which an inference of discriminatory intent might be drawn[;] (2)

systematically better treatment of similarly situated employees[;] (3) that the employee's

justification was pretextual." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019)

(*Lewis II*) (internal citations and quotations omitted).

While this circuit does not appear to have analyzed a mixed-motive failure to promote

claim in a published opinion, it has declined to apply the "no reasonable person" standard to a

mixed-motive claim in unpublished opinions. *See Denham v. Alabama State University,* 2024

WL 2200545 at *5 (11th Cir. May 16, 2024); *Martin v. Shelby County Board of Education,* 756

Fed.Appx. 920, 924 (11th Cir. 2018).  Various district courts have recognized that the "no reasonable person" standard on which Homewood relies is inapplicable to mixed-motive claims. *See e.g., Kelly v. Howden*, 2021 WL 9759601 at *6 (N.D. Ga. September 20, 2021); *Smith v. Office of Attorney General*, 2020 WL 4015622 at *13 (M.D. Ala. July 16, 2020) (Huffaker, J.); *Collins v. Koch Foods Inc.*, 2019 WL 4599972 at *9 (N.D. Ala., September 23, 2019) (Axon, J.); *Joyner v. City of Atlanta*, 2019 WL 12426047 at *7 (N.D. Ga. September 13, 2019); *Akridge v. School Board of Alachua County*, 2019 WL 13084482 at *2 (N.D. Fla. May 28, 2019); *Ketchup v. Savannah-Chatham County Public School System*, 2016 WL 5402752 at *5 (S.D. Ga. September 26, 2016). That rationale makes sense, as the motivating factor clause of Title VII explicitly assumes that lawful factors other than race could conceivably influence an employment action that was still tainted with bias. The lower bar for mixed-motive cases would be incongruent with an evidentiary requirement that effectively demands proof convincing enough to discredit any legitimate explanation for a promotion.

Webb relies on several pieces of circumstantial evidence to infer that the selection for Battalion Chief in September and October 2020 was at least partly influenced by race. First, Homewood's systematically poor track record of hiring and promoting Black firefighters: as of the time Webb left the department, no Blacks had been hired between 2013 and 2021, and there were only two Black firefighters, a number that rose to three out of 75 by the time of Hill's deposition in January 2024, which equates to 4.0%. (Doc. 37-2, Hill depo. at 225-26). Hill recalls that out of 35-40 new hires during his time as Chief, one was Black (Doc. 37-2, Hill depo. at 218-21). Those numbers are well below Homewood's Black population of around 13%. It took Webb 21 years to be promoted to officer rank as a lieutenant, while 15 to 20 White firefighters hired after Webb were promoted in the interim. (Doc. 32-1, Webb depo. at 163-64).[3] When

---

[3] The record identifies one other Black officer, Captain Harris. (Doc. 32-2, Hill depo., at 190).

pressed for an answer about the low rates of hire for Black candidates, Hill offered the defense that Black candidates rarely had the requisite level of training, and that, unlike Birmingham, he was not willing to "hire people right off the street with no qualifications." [4] (Doc. 32-2, Hill depo. at 232).

Then there are the notable gaps in experience between Webb and the two white candidates for Battalion Chief who were selected over him. Webb not only served in the department for substantially longer than did both Brandon Broadhead and David Everson, but also served for two years in the rotation of officers who filled in as Battalion Chief—a credential that Broadhead did not have; furthermore, in contrast with Everson and Broadhead, Webb had management-level experience both running a fire station and serving as the head of maintenance at the other, the largest in the city. (Doc. 37-1, Webb dec. at ¶¶ 6-13; Doc. 32-2, Hill depo. at 197-98, 247). Webb, a captain, was also of a higher rank than Broadhead, a lieutenant. (Doc. 32-2, Hill depo. at 197-98).

Homewood makes several efforts to explain why Webb's credentials were still deemed inferior. There is an assertion that Broadhead had unusually strong leadership skills, but when pressed for examples, Hill could only come up with generalities and references to Broadhead acquiring experience in budgeting and handling civilian complaints when the prior Chief assigned him administrative duties in the central office. (Doc. 32-2, Hill depo. at 203-05). But it is far from evident that either activity compared with Webb's operational management roles at two stations and his regular fill-in stints as Battalion Chief. And the fact that Broadhead was

---

[4] Hill and Webb appeared to offer conflicting testimony on the extent to which Blacks are in the hiring pool for HFD. Webb testified that he consistently noticed names on the applicants list that appeared to be ethnic Black names (Doc. 32-1, Webb depo. at 160-61), while Hill claimed that he did not recall interviewing a single Black candidate (Doc. 32-2, Hill depo. at 225). Homewood's counsel adds his interestingly phrased view that Homewood interviews Blacks when they "show up for the interview" despite an absence of record evidence that Black applicants no-show interviews to any degree. (Doc. 34 at 24).

afforded administrative duties when a higher-ranking Black officer was not is suspect in its own right.

In addition, Homewood relies on the narrative that Webb had not been certified as a paramedic, which Hill portrayed as one of the most critical components of the Battalion Chief's role. But Hill admitted that he has no evidence that the job description for Battalion Chief prepared by the Jefferson County Personnel Board lists paramedic credentials as a requirement. (Doc. 32-2, Hill depo. at 206). He concedes that Webb was not told during his interview for Battalion Chief that he was not qualified for the role. (Doc. 32-2, Hill depo. at 208). Homewood's claim is also belied by the fact that Webb was permitted to serve as fill-in Battalion Chief on a recurring basis for the better part of two years. (Doc. 37-1, Webb dec. at ¶ 16).

Homewood's other argument is that Webb did not score high on its internal matrix ranking candidates based on their levels of experience in specialized areas of firefighting service. But while Hill testified that he believed Everson was the highest-ranked contender, the matrix produced by Homewood in its evidentiary submission does not list Everson's name; nor, for that matter, is Broadhead's name listed. (Doc. 32-4, Ex. D, "Criteria Scores" at 1-2). Even if Hill's deposition testimony is credited to the effect that Homewood produced the wrong document (Doc. 32-2, Hill depo. at 182), it is telling that the city has not cured the purported error six months later and still cites the same spreadsheet that omits Everson. Also, the absence of Broadhead in Homewood's submission of its purported list of candidate scores supports the inference that Broadhead was selected without even being given an assessment on the skills matrix. That factor alone strongly hints that Homewood's rationale that the skills matrix was decisive in the promotion for Battalion Chief is pretextual. *See Patterson v. Georgia Pacific, LLC*, 38 F.4th 1336, 1352 (11th Cir. 2022) (to establish pretext, an employee can offer evidence

of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's articulation of nondiscriminatory reasons).

The quantum of proof needed to overcome summary judgment on a mixed-motive claim is not substantial. *See Burton v. Gwinnett County*, 756 Fed.Appx. 926, 930 (11th Cir. 2018) (plaintiff's "burden in providing evidence sufficient to survive summary judgment on a mixed motive theory is light"). A case in the Middle District of Alabama is instructive. In *Gipson v. Hyundai Power Transformers USA Inc.*, 2019 WL 2953174 (M.D. Ala. April 4, 2019) (Borden, J.), the magistrate judge concluded that summary judgment was not warranted in a mixed-motive pay disparity case even when the plaintiff's evidence was insubstantial by any measure; there, the plaintiff relied on three years out-of-date evidence of discrimination in job evaluations involving co-workers with different decision-makers, and his testimony that there was documented evidence of wage discrepancies between Blacks and Whites failed to elaborate on whether the potential comparators were similar in responsibilities and experience. *Id*. at *15. Still, the magistrate judge reasoned that a single thread of evidence—one of the plaintiff's White colleagues was paid more despite receiving lower evaluations—was sufficient to overcome summary judgment under a mixed-motive standard. *Id*. The district court agreed. *Gipson,* 2019 WL 2932747 at *1-2 (M.D. Ala. July 8, 2019) (affirming mixed-motive aspect of ruling) (Thompson, J.).

In a mixed-motive analysis, a plaintiff does not have to allege evidence that a decision-maker made statements indicating that bias factored into their decisional process. *Smith*, 2020 WL 4015622 at *13. On the record in this case, Webb has presented details that he had much more significant managerial experience than did either of the two White candidates who were selected over him for Battalion Chief, including a track record of performing the job

capably on a fill-in basis; he outranked one candidate; Homewood claims to have relied on an assessment matrix that was not applied to at least one and possibly both candidates favored over Webb; a central explanation offered for why Webb was not qualified is inconsistent with the job description and the fact that Webb had regularly filled in as Battalion Chief on an interim basis; and then there is Homewood's poor record of hiring and promoting Black candidates.

In the context of a single-motive mosaic theory claim, the Eleventh Circuit has reversed a grant of summary judgment on comparable facts. In *Brown v. Wrigley Manufacturing Company, LLC*, 2023 WL 2386500 (11th Cir. March 7, 2023), the circuit court found a material issue of facts in a failure to promote case based on evidence that the employer had a poor record of promoting Blacks; elevated less-qualified White candidates at the plaintiff's expense for subjective, ill-defined reasons; and circumvented its internal hiring process to favor Whites. *Id.* at *6.

A reasonable jury could infer that Webb's failure to be selected to either of the Battalion Chief openings in September and October 2020 was partly motivated by racial bias, and summary judgment is due to be denied as to Count I.

### C.    The retaliation claim against Chief Hill

Webb also asserts a retaliation claim under Section 1981, Count II, based on Chief Hill's decision to remove him from active duty within a month of his filing of an EEOC charge based on Hill's failure to promote him to Battalion Chief.[5]

Retaliation claims under Sections 1981 and 1983 are evaluated under the same standards of proof as Title VII claims. *See Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009). Plaintiffs may proceed under one of two analytical frameworks: the *McDonnell Douglas*

---

[5] In the operative Complaint, Webb based his retaliation claim in part on the directive that he undergo a physical examination after being cleared to return to work after a Covid related leave. Based on the development of the evidence, which suggests that the physical was a regularly scheduled event, Webb does not pursue that claim.

formula, with its requirement that a plaintiff first prove a prima facie case by showing that he engaged in protected activity and suffered an adverse employment action, and that a causal connection exists between the two events. *Tolar v. Bradley-Arant Boult Cummings, LLP*, 997 F.3d 1280, 1289 (11th Cir. 2021). As with a disparate treatment claim, if an employee makes out a prima facie case, the burden shifts to the employer to establish a legitimate explanation for the challenged action. *Id*. If the employer does so, the ultimate burden shifts to the plaintiff to prove that the rationale is a pretext for retaliation. *Id*.

But a retaliation plaintiff is not limited to the *McDonnell Douglas* structure and may proceed under the mosaic evidentiary tool described above. *See Yelling*, 82 F.4th at 1342. As the circuit court recently observed, "[t]he...question for the court at summary judgment[] is only whether the evidence permits a reasonable factfinder to find that the employer retaliated against the employee. That legal standard applies no matter how an employee presents [his] circumstantial evidence." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1311 (11th Cir. 2023).

In addition, retaliation claims must provide sufficient evidence that the alleged retaliatory animus was "but-for" cause of the challenged employment action. *University of Texas Southwest Medical Center v. Nassar*, 570 U.S. 338, 360 (2013). The Supreme Court has made clear that but-for causation does not require that an employee is obligated to disprove all potential causes of the retaliatory event, as events can have "multiple but-for causes." *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020). "That means an employer cannot escape liability by pointing to some other factor" as long as an impermissible factor like retaliation was also a but-for factor. *Yelling*, 82 F.4th at 1339. Or put another way, "[I]f there were two but for causes—unlawful retaliation and a lawful factor—[a plaintiff] could have a claim if the two combined to result in an adverse

action that would not have occurred without that combination. In that instance, the retaliation would be a but-for cause because the adverse action would not have occurred without it. The fact that a lawful consideration was also a necessary factor would not defeat [his] claim." *Id*. at 1340.

Hill does not dispute that an EEOC charge is protected activity or that he knew of the charge two weeks before assigning Webb to administrative duty. He seems to challenge that his placement of Webb in an administrative role is an adverse action for purposes of a retaliation claim. In *Monaghan v. Worldpay U.S. Inc.*, 955 F.3d 855, 861 (11th Cir. 2020), the Eleventh Circuit adopted the theory of retaliatory mistreatment: the test of such a claims is whether the employer's conduct "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. (quoting *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006)). The "retaliation standard protects employees more broadly—and is more easily satisfied—than the standard applicable to claims of discrimination." *Monaghan*, 955 F.3d at 861.

While Hill portrays Webb's reassignment as nothing more than a swap from one role to another, it is undeniable that the entire terms of Webb's job would have been altered. He would have transitioned involuntarily from a leadership management-level role over firefighters to some undefined set of desk responsibilities. It would have been the equivalent of a partner at a litigation firm being stripped of the capacity to write briefs, conduct depositions, or supervise associates. The forced diminution of job duties is almost the prototype of conduct that would dissuade an employee from challenging discrimination in their workplace.

Moreover, given that the Supreme Court has recently held that workplace transfers constitute adverse actions for purposes of substantive discrimination claims, *see Muldrow v. City of St. Louis, Mo.*, 144 S.Ct. 967 (2024), this circuit's intent that retaliation claims should be

treated as more expansive than discrimination claims essentially settles the question of whether Webb's reassignment was actionable. It unmistakably was.

Turning to the question of whether Webb can show his reassignment was retaliatory, Hill's principal argument is that he relied on the recommendation from one of Homewood's occupational health providers, Dr. C.B. Thuss, that Webb should be evaluated for potential cardiac and pulmonary issues before undergoing Homewood's newly adopted job task fitness test. But Hill's briefing ignores the fact that nothing in Dr. Thuss' correspondence to Hill recommended that Webb be restricted from performing his daily job responsibilities. (Doc. 32-12, Thuss letter at 1-3). As Dr. Thuss acknowledged in his deposition, none of the findings in the physical indicated that Webb's heart condition had weakened since his last EKG in 2019; and Thuss did not see anything in the examination results that justified ordering another EKG. (Doc. 32-13, Thuss depo. at 54-58, 55-56). The changes in Webb's breathing as indicated in the spirometry test were not significant enough to correlate to the onset of a pulmonary disease. (Doc. 32-13, Thuss depo. at 61-63). Thuss allowed that he saw no reason to warn Webb that his health or life would be endangered if he continued to work.[6] (Doc. 32-13, Thuss depo. at 53-54, 72).

Hill's counter is that regardless of Webb's capacity to perform his job, the question of whether he could safely take the job task test provided separate grounds to remove him from active duty. But the April 6, 2021 memo that instituted a policy of reassignment to administrative work in the event an employee could not pass the job task test was issued the same day as Hill learned of Webb's EEOC charge alleging discrimination in promotions and a pattern of failing to

---

[6] To be sure, Hill only had the benefit of Thuss' letter, not Thuss' concessions under close questioning that the document may have overstated Webb's medical issues. But the letter taken on its face does not offer justification for moving Webb off of active duty. Had Hill simply followed the letter and ordered Webb to have the additional testing Dr. Thuss described while he continued his work, Webb would not have a retaliation claim.

hire Black firefighters. (Doc. 32-2, Hill depo. at 38, 90-98). That policy was a conspicuous departure from an earlier version of the job task directive issued on February 26, when the test was adopted as department policy but there were no references to administrative duty based on an inability to successfully complete the test. (Doc. 32-7, Ex. G, "2.26.21 email" at 1-2; Doc. 32-2, Hill depo. at 92-93). And the April 6 memo went considerably further than Hill's announcement of the job fitness test at an executive staff session in August 2020, where according to the minutes, Hill described no job repercussions in the event a firefighter could not accomplish the tasks in the fitness test. (Doc. 32-2, Hill depo. at 97-98). In other words, the job task requirement with no consequences for failure suddenly morphed on the day the EEOC charge was revealed to Hill into a mandatory reassignment policy.

The record is unclear which came first, the reassignment memo or the email from the Mayor's office to Hill notifying him of the charge. The notification message was never produced in the discovery process despite its clear relevance to a material issue in the case. At deposition, Hill claimed he does not remember the sequence. (Doc. 32-2, Hill depo. at 91). But at no point has Hill offered evidence that the charge notice came second or that there is an earlier draft created prior to April 6. And the timing on the April 6 job task message is late afternoon, 3:48 PM CT. (Doc. 32-2, Hill depo. at 90).

Absent proof that suggests otherwise, the obligation is to draw reasonable inferences in Webb's favor at the summary judgment stage. At minimum, a jury could conclude that Hill learned Webb filed a discrimination complaint with a federal agency prior to the change of policy. A jury could easily reason that if Hill could disprove the inference that the charge notice came first, he and his lawyers have had a year of litigation to do so and their silence is telling.

This circuit has consistently treated very close temporal proximity between knowledge of protected activity and an adverse employment action as proof of retaliatory causation under either the prima facie phase or the pretext inquiry of a summary judgment analysis. *See Thomas v. Cooper Lighting Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). The suggestion of causation is especially persuasive when there is no evidence of some other intervening event that might explain away the close link in time—such as earlier communications that suggest the adverse action was already planned or contemplated. *See Berry*, 84 F.3d at 1309 (investigation of misconduct was well underway before employee's two complaints in the week prior to her termination); *Fitzgibbon v. Fulton County, Ga.*, 842 Fed. Appx. 385, 389 (11th Cir. 2021) (employee's termination for bullying and poor performance was "already contemplated and in motion" prior to her complaint of discrimination); *Tucker v. Florida Department of Transportation*, 678 Fed.Appx. 893, 896 (11th Cir. 2017) (plaintiff's supervisor had decided to terminate her prior to receiving notice of complaint); *Quigg*, 814 F.3d at 1245 (ethics concerns regarding superintendent preceded school board's knowledge of her discrimination complaint). Hill does not make such a showing here.

There is another piece of pretext evidence. Hill concedes that from the implementation of the job task test in 2021 to his retirement effective this year, no other firefighter was precluded from taking the test and reassigned to desk duty. (Doc. 32-2, Hill depo. at 156). Yet, Hill admits there were firefighters that he viewed as obese, which is a well-understood risk factor. (Doc. 32-2, Hill depo. at 129-30). It is implausible that if Hill's action toward Webb reflected nothing but a desire to avoid placing a firefighter with risk factors in danger, that no other individual in the department presented a similar risk of harm.

The ultimate test in a retaliation inquiry requires the employee to go beyond proof of pretext to establish that retaliatory animus was the true reason for the challenged conduct. *Gogel v. Kia Motors Manufacturing of Georgia, Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020) (*en banc*). Here, Webb provides such evidence. Hill admitted in deposition that he was "taken aback" by the contents of the EEOC charge and viewed them as a set of false allegations against himself. (Doc. 32-2, Hill depo. at 48-49). There is also Hill's testimony that in March 2021, he heard rumors that Webb was having physical challenges after he returned from a bout with Covid. (Doc. 32-2, Hill depo. at 116-17). A jury could infer that Hill believed that the April 6, 2021 reassignment policy would affect Webb. Then there is the detail that when Hill heard rumors of Webb physically struggling after returning from leave due to Covid, Hill failed to even investigate (Doc. 32-2, Hill depo. at 116-17), which undercuts his claim that his actions post-charge were solely health related.

In addition, there are a number of assertions of retaliatory animus on Hill's part by another HFD firefighter, Tony Franklin. In his own EEOC charge, filed last year, Franklin alleges that on June 30, 2023, he sent an email to Homewood's Mayor and his executive assistant, as well as the senior leadership in the fire department, contending that HFD had an entrenched pattern of promoting only white males and that the entire top ranks of the organization consisted of white men. (Doc. 37-2, Franklin EEOC charge at 3). According to Franklin, within a week of his email, he was warned by a senior officer that Chief Hill and then Deputy Chief Broadhead made comments that "going forward, [Franklin] needs to be very careful." (Doc. 37-2, Franklin EEOC charge at 3). Soon after that, another officer told him that "there are three people who run this department, and you better not f*** with any of them." (Doc. 37-2, Franklin EEOC charge at 3). Franklin further alleges that his lieutenant further advised that he had been instructed by "the

highest levels of HFD to start building a disciplinary paper trail of every possible infraction he can find on [Franklin]." (Doc. 37-2, Franklin EEOC charge at 3).

Franklin then alleges that, as warned, he began to incur various reprisals at work. Among other things, he claims unwarranted disciplinary write-ups; that he stopped receiving extra work assignments on other shifts, which Franklin says senior firefighters rely on to earn more income; and that he was assigned to another station partly to separate him from another Black officer whom HFD feared might file a lawsuit. (Doc. 37-2, Franklin EEOC charge at 3). While Homewood disputes Franklin's retaliation claims in its EEOC position statement, if a jury chose to believe Franklin, his allegations of immediate and persistent retaliation for reporting discrimination to senior leadership sheds light on Hill's motivations in the aftermath of Webb's complaint to a federal agency. *See Jenkins v. Nell*, 26 F.4th 1243, 1251 (11th Cir. 2022) (co-worker allegations of discriminatory conduct can infer unlawful bias on the part of a decision-maker).

Taking the evidence in the record in totality, Webb has established enough in the way of inferences and factual disputes that a jury could find in his favor on the retaliation count, and summary judgment is inappropriate.

**V.    CONCLUSION**

For all the foregoing reasons, Defendants' Motion for Summary Judgment as to Counts I and II of the operative Complaint is due to be denied.

Respectfully submitted the 24th day of June, 2024.

**HKM Employment Attorneys LLP**

*s/Artur Davis*
Artur Davis
ASB-3672-D56A
2024 3rd Ave. North, Suite 212

Birmingham, AL 35203
Direct: 205-881-0935
adavis@hkm.com

**Attorney for Plaintiff Demetrius Webb**

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned counsel certifies that on June 24, 2024, Plaintiff's Memorandum Brief in Opposition to Defendants' Motion for Summary Judgment was served electronically through the Court's CM/ECF filing system upon the attorneys of record for Defendants City of Homewood and Chief Nicholas Hill, listed below:

Wayne Morse
Michael J. Kendrick
**Waldrep, Stewart, and Kendrick LLP**
2850 19th St. South
Suite 370
Homewood, AL 35209
Tel: 205-254-3216
morse@wskllp.com
kendrick@wskllp.com

By:

**HKM Employment Attorneys LLP**

*s/Artur Davis*
Artur Davis
ASB-3672-D56A
2024 3rd Ave. North, Suite 212
Birmingham, AL 35203
Direct: 205-881-0935
adavis@hkm.com