## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **DEMETRIUS WEBB,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:23-cv-1098-RDP** |
| | } | |
| **CITY OF HOMEWOOD ALABAMA, et al.,** | } | |
| | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

Before the court is the Motion for Summary Judgment (Doc. # 33) and the Motion to Strike Evidence Submitted by Plaintiff Opposing Summary Judgment (Doc. # 40) filed by Defendants the City of Homewood and Chief Nicholas Hill (collectively, "Defendants"). The Motions have been fully briefed. (Docs. # 33, 34, 37, 38, 39, 41; 40, 42, 43). After careful consideration, and for the reasons outlined below, Defendants' Motion for Summary Judgment (Doc. # 33) is due to be granted in part and denied in part, and Defendants' Motion to Strike (Doc. # 40) is due to be denied as moot.

### I.      Background

This case involves Plaintiff's allegations of race discrimination and retaliation. Plaintiff used to work for the Homewood City Fire Department. He alleges that he was passed over for a promotion because of his race and then retaliated against for filing an EEOC charge.

The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the non-moving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281

F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

### A.    The Battalion Chief Position

Plaintiff Captain Demetrius Webb ("Plaintiff") is a Black male who served as a firefighter in Homewood, Alabama with the Homewood Fire Department ("Homewood FD") for 36 years. (Doc. # 26 ¶ 9). Plaintiff brings this action alleging employment discrimination against the City of Homewood ("Homewood") under Title VII of the Civil Rights Act of 1964 and against Chief Nicholas Hill ("Chief Hill"), in his individual capacity, under 42 U.S.C. §§ 1981 and 1983. (Doc. # 26). Specifically, Plaintiff alleges that race was a motivating factor in Homewood's failure to promote him to the rank of Battalion Chief. (*Id.* ¶ 1). And, Plaintiff alleges that Chief Hill "retaliated against [him] for opposing racially discriminatory practices by wrongfully declaring him physically ineligible for duty." (*Id.*).

Plaintiff started working as a firefighter with the Homewood FD in 1985. (Doc. # 32-1 at 39). At the Homewood FD, while the ranks have changed over time, they generally are as follows (from the top down): Chief, Deputy Chief, Battalion Chief, Captain, Lieutenant, and Apparatus Operator. (Doc. # 32-2 at 61). In 2006, Plaintiff was promoted to the position of Apparatus Operator and then in 2007, promoted to Lieutenant. (Doc. # 32-1 at 20). In 2018, Plaintiff was promoted to Captain (*id.*), which was a position that did not exist at the Homewood FD until 2017. (Doc. # 32-2 at 61).

As of January 2024, the number of firefighters with the Homewood FD was around seventy, and three of those seventy individuals were Black. (*Id.* at 56). Chief Hill testified that in the last twenty years or so, nine or ten Black firefighters have been hired by the Homewood FD.

(*Id.*). And during his tenure as Chief, Chief Hill hired one Black candidate out of thirty-five to forty total hires. (*Id.*). When Chief Hill first became Chief in 2020 (*id.* at 5), he was in charge of the hiring at the Homewood FD, but sometime around early to mid 2021, once the Homewood FD "got a senior staff back together," he stepped out of the process. (*Id.* at 57).

Before the Homewood FD engages in the hiring process though, the Jefferson County Personnel Board determines the job description for firefighters and creates the minimum standards and qualifications for a firefighter. (*Id.* at 21-22). The Personnel Board determines whether an applicant meets the minimum standards and qualifications, and then sends a list of the applicants who meet those standards and qualifications to the Homewood FD. (*Id.* at 43, 60). When the Homewood FD receives the applications, the applicants' demographic information is not included. (*Id.* at 57). Because the Homewood FD receives its information from the Personnel Board, Homewood FD cannot determine the race of the applicants. (*Id.*). When discussing the Homewood FD's hiring practices, Chief Hill testified that who Homewood FD hires has a lot to do with qualifications, and the department places an emphasis on applicants who are paramedics. (*Id.* at 57, 59). For example, if the department loses a firefighter who was a paramedic, it tries to replace the departed paramedic with another paramedic. (*Id.* at 57). Chief Hill testified that the Homewood FD "typically hired firefighter paramedics when [the department] could – when they were on the list, especially if [the department] lost one." (*Id.* at 59). He explained that the Homewood FD hires people who are already qualified paramedics because doing so saves the department approximately $30,000 in training costs. (*Id.*). Chief Hill further explained that this is a different business plan than some other fire departments, like Birmingham, which hires applicants without these qualifications and trains them. (*Id.*).

As noted earlier, Plaintiff was promoted to Apparatus Operator in 2006 and then to Lieutenant in 2007, some twenty-one to twenty-two years after he first started with the Homewood FD in 1985. (Doc. # 32-1 at 20). In his deposition, Chief Hill was asked why it took so long for Plaintiff to be promoted. (Doc. # 32-2 at 60). Chief Hill responded,"[I]f he applied for the Personnel Board test, if he took it, he either didn't pass with a 70, or he didn't score a high enough grade to get an interview, and he wasn't on the certification list provided by the Personnel Board of Jefferson County." (*Id.*). When Chief Hill was asked why there was an eleven-year gap between Plaintiff's promotion to Lieutenant in 2007 and his promotion to Captain in 2018, Chief Hill responded, "The position for captain didn't exist until 2017. No one got promoted to captain." (*Id.* at 61).

In September and October 2020, two Battalion Chief positions became available (*id.* at 48) – one of which was a temporary opening. (*Id.*). The Battalion Chief position was created sometime around 2004 or 2005 (*id.* at 55) and within the Homewood FD, there are currently four Battalion Chiefs – each with a different role. (*Id.* at 43). Since the position was created, there have been nine or ten individuals employed as a Battalion Chief. (*Id.* at 56). In the last twenty years, two Black individuals – one of whom was Plaintiff – have applied for the position of Battalion Chief. (*Id.*). The Battalion Chief position was previously selected by a panel of individuals who interviewed the candidates and evaluated their mission statements. (*Id.* at 43). However, when Chief Hill became the Fire Chief in 2020, he decided to do away with the old method because he was concerned that the process of selecting a Battalion Chief was too subjective. (*Id.* at 46). Chief Hill devised his new method for selecting the Battalion Chief position sometime in or around September or October 2020. (*Id.*). The new method consisted of an interview by him (as opposed to an interview by a panel) (*id.* at 49), a review of the applicants' resumes (*id.* at 50), and the

creation of a matrix where the applicants' qualifications were assigned a number value for various levels of qualifications. (*Id.* at 44).[1] Regarding the new method, Chief Hill testified that he primarily looked at the applicants' scores in the matrix and secondarily looked at their resumes. (*Id.* at 45). Chief Hill acknowledged that although he interviewed the candidates, the interviews were "not really" a factor in the selection process. (*Id.* at 50).

When the two Battalion Chief positions became available in the fall of 2020, there were two Black applicants: Plaintiff and Robert Harris. (*Id.* at 49). Neither Plaintiff nor Harris was selected for the Battalion Chief positions. (*Id.*). Brandon Broadhead – a white male – filled the first Battalion Chief opening. (*Id.*). At the time Broadhead was promoted to Battalion Chief, his rank was lower than Plaintiff's rank and he had only been with the Homewood FD for twelve or thirteen years. (*Id.* at 51). In contrast, Plaintiff had been with the Homewood FD for thirty-five years. (*Id.*). However, Broadhead had previously worked for two other fire departments (*id.*), and Defendants note that even Plaintiff agreed that having more years of experience does not necessarily make someone the best candidate. (Doc. # 32-1 at 23). Plaintiff testified that "it's a broad spectrum . . . it's knowledge, skills, trustworthiness, integrity. . . . It's no one set goal or one set thing." (*Id.*). When remarking on his selection of Broadhead to Battalion Chief, Chief Hill testified that Broadhead "had a natural gift for leadership and administration and outweighed everyone on that scale." (Doc. # 32-2 at 51). Chief Hill explained that Broadhead demonstrated his leadership skills through the way he handled budget issues, complaints from the public, and administrative duties. (*Id.*). Chief Bresnan, who was the Fire Chief before Chief Hill, had provided Broadhead with the opportunities to gain experience with the Homewood FD's budget and fielding

---

[1] For example, if an applicant had a bachelor's degree, he received two points to his score, and if the applicant had an associate's degree, he received one point. (Doc. # 32-2 at 45) (*see also* Doc. # 32-4 at 2) (detailing the matrix and how applicants were scored).

civilian complaints. (*Id.* at 52). Plaintiff complains that these opportunities were not provided to him. (*Id.*).

David Everson – another white male – filled the second Battalion Chief opening, which was the temporary opening. (*Id.* at 54). Chief Hill testified that Everson was selected because he was "already the relief commander on B shift" and he was the "second in command for the AMAS team" and therefore was "already familiar with the AMAS responsibilities" of the B shift Battalion Chief. (*Id.* at 54). Plaintiff had been employed by Homewood FD longer than Everson, and he had been a Captain longer than Everson. (*Id.*). Additionally, much of Everson's experience was with a much smaller and largely rural fire department in McCalla, Alabama. (*Id.*).

In his deposition, Chief Hill testified that he conducted only one interview and considered the candidates for both positions instead of creating two separate applicant pools. (*Id.* at 49). A Homewood FD document shows the matrix scores of the Battalion Chief candidates as follows: Adam Ashworth, 27; Alexander Glover, 28; Robert Harris, 22; Keith Headrick, 23; Mark Shannon, 29; and Demetrius Webb, 18. (Docs. # 32-4 at 2; 32-2 at 50). The matrix does not include the scores for Broadhead and Everson, who were eventually chosen for the two Battalion Chief positions.[2] (*See* Doc. # 32-4 at 2). However, when asked in his deposition, Chief Hill testified that he thought Everson "was close to" the score of 29. (Doc. # 32-2 at 50).

When Chief Hill was asked in his deposition whether Plaintiff had any deficiencies that led him to think Plaintiff was not "well-suited" to be a Battalion Chief, Chief Hill responded:

> A: I think – well, yes. So he was not a paramedic. That's over 60 percent of our calls – 64 to 67 percent of our calls are EMS calls. Since 1994, we've never had a

---

[2] In Chief Hill's deposition when Chief Hill was shown the matrix that did not include David Everson, Chief Hill stated, "It appears that we sent you the wrong form." (Doc. # 32-2 at 46). He testified that the form was wrong "[b]ecause I know the one I used had David Everson's name on it." (*Id.* at 47). Despite this conversation, the matrix that Defendants produced into evidence does not include David Everson's name. (*See* Doc. # 32-4 at 2).

> battalion chief on a shift that was not a paramedic. Additionally, he just didn't have
> the same certifications and qualifications as the other battalion chiefs.

(*Id.* at 53). Although Chief Hill stressed the importance of paramedic credentials, there is no evidence that the posted job qualifications for the Battalion Chief position required such a certification. (*Id.*). Additionally, Chief Hill never told Plaintiff that he did not have the adequate qualifications to be a Battalion Chief or that he was not going to be selected because he lacked the paramedic credentials. (*Id.*).

###    B.    The Annual Job Task

Sometime in or around 1996, Chief Bresnan implemented the requirement for the Homewood FD firefighters to complete annual physical exams. (*Id.* at 16). Over his years with the Homewood FD, Chief Hill had concerns that these annual physicals were not adequately measuring whether the firefighters could do their job. (*Id.*). Chief Hill decided in August 2020 that the Homewood FD needed to have an additional physical fitness test. (*Id.* at 15). When asked why he thought implementing an additional test was important, Chief Hill replied:

> Firefighting is a hard job. It's a hard physically demanding job to be able to put on
> that gear and go do that job under stress and heat and all kind of dangerous
> environments. I felt like it was important that you be physically fit. The only way
> to have some measure of whether you were fit or not, and so we – I decided that we
> should have a job task.

(*Id.*). He further explained that other departments around the Homewood FD were implementing similar measures and he thought the Homewood FD "would be better well-served to have that." (*Id.* at 16).

On August 6, 2020 (shortly after Chief Hill became Fire Chief), a staff meeting was held wherein Chief Hill discussed implementing the additional physical fitness test for the firefighters to complete. (*Id.*; *see also* Doc. # 32-5 at 8-9 (meeting minutes detailing the conversation about the physical fitness test)). Those attending the meeting consisted of the Homewood FD Senior

Staff, including Plaintiff. (Doc. # 32-5 at 2, 7). Chief Hill referred to the additional physical fitness test as the "Annual Job Task" and planned for it to mirror the joint wellness fitness initiative by the International Association of Fire Chiefs and the International Firefighters Association. (Doc. # 32-2 at 19). The Annual Job Task consisted of nine physical tasks, including crawling over rafters; driving a Keiser sled; dragging a large truck tire; and carrying a roof ladder. (*See* Docs. # 32-6 at 2; 32-1 at 40-41 (listing the nine tasks of the Annual Job Task)).

In early 2021, Plaintiff was diagnosed with COVID. (Doc. # 32-1 at 9-10). And on February 5, 2021, Plaintiff was admitted to the hospital because of difficulty breathing and "severe respiratory distress." (*Id.* at 6). When Plaintiff was admitted, the hospital noted that he was a sixty-three-year-old male with a history of atrial fibrillation, hypertension, and a history of coronary artery disease.[3] (*Id.* at 6). Sometime in or around February 23, 2021, Plaintiff was cleared to return to work (*id.*) by his personal physician, Dr. Wynne. (*Id.* at 47).

The Homewood FD has return-to-work rules and regulations that govern what a firefighter must do after being absent from work. (*Id.* at 15). Plaintiff explained the return-to-work rules: "You're required to contact your supervisor to let them know you're coming back to work. You bring a doctor's excuse from your doctor. And once you get that excuse, then you're given a fit-for-duty physical." (*Id.*). Following the clearance by his physician, Dr. Wynne, and in accordance with the Homewood FD's return-to-work rule, Plaintiff saw Dr. Lott for his fit-for-duty physical, and Dr. Lott cleared him to return to work. (*Id.* at 47). Plaintiff then returned to work the last week of February 2021. (*Id.* at 44). After he returned to work, from late February until April 21, 2021, Plaintiff went on some thirty-five to forty calls. (*Id.*). Plaintiff said he suffered no physical

---

[3] Plaintiff also has a few other medical conditions. For example, he uses a CPAP machine (*id.* at 6) and has an implanted IVC filter to combat blood clots. (*Id.* at 7). And for many years, Plaintiff has been on blood thinner medication and medication for his blood pressure and cholesterol. (*Id.* at 4).

difficulties during those calls. (*Id.*) However, around this time, Chief Hill heard rumors that Plaintiff would tell his crew that he would operate the pump panel instead of entering the structure fire. (Doc. # 32-2 at 31). Chief Hill never followed up on these rumors, nor did he talk to Plaintiff about them or document them. (*Id.*).

On February 26, 2021, Chief Hill sent an email to the firefighters of the Homewood FD informing them that the Annual Job Task would be conducted from April 26 through May 1. (Docs. # 32-7 at 2; 32-2 at 22-23). In his email, Chief Hill stated that "[p]articipation is mandatory" and that "[t]he intent is to supplement [the department's] annual medical physicals and to add job related task that can be expected to be performed on the fire ground to gauge [one's] ability to perform [their] essential job functions." (Doc. # 32-7 at 2). He also stated that "success or failure in the job task is in no way punitive, it is however another method we will be implementing in the department to ensure we are ready to provide excellence in service to our community." (*Id.*).

In addition to the Annual Job Task scheduled for April/May 2021, it had been the practice for many years that the firefighters' annual physicals were conducted in March and April. (Doc. # 32-2 at 28). On March 23, 2021, Plaintiff saw Dr. Thuss for his annual physical exam. (*Id.* at 13). During the exam, Dr. Thuss presented Plaintiff with his lab results, which were discussed, and a physical exam was performed. (Doc. # 32-13 at 11-12). Without Dr. Thuss's knowledge, Plaintiff recorded this visit. (Doc. # 32-2 at 16). In the exam, Plaintiff questioned Dr. Thuss as to why he was being "singled out" and having to endure another physical exam. (Doc. # 32-8 at 14). Dr. Thuss explained to Plaintiff that he was not being singled out (*id.*) and that he had tested someone else earlier. (*Id.* at 2). During his exam of Plaintiff, Dr. Thuss stated "[L]et's make sure your lungs are working good. You had COVID. Let's make sure the lungs are working good. EKG show some changes that could be consistent with either lung and/or heart, and if the lungs aren't working

9

good, then the heart's not getting enough oxygen." (*Id.* at 3). Dr. Thuss also offered to compare Plaintiff's past lab results with his current ones, but Plaintiff declined. (*Id.* at 7). Although not relayed to Plaintiff during the exam, Dr. Thuss testified in his deposition that he saw Plaintiff in part for his fitness to take the Annual Job Task. (Doc. # 32-13 at 22). At the time of the exam, Dr. Thuss was generally aware of the requirements for the Annual Job Task. (*See id.* at 14 (Dr. Thuss recalling the various tasks of the Annual Job Task)).

On March 28, 2021, shortly after his exam by Dr. Thuss, Plaintiff filed an EEOC charge. (Docs. # 32-1 at 38; 31-10). Although the charge was filed in March, Plaintiff stated that he first contacted the EEOC sometime around November or December 2020. (Doc. # 32-1 at 43). Around the time he first contacted the EEOC, Plaintiff told four people about his plans to file an EEOC charge. (*Id.*). Plaintiff's March 28, 2021 EEOC charge included the following allegations: "Upon information and belief, my employer engages in discriminatory selection procedures in recruiting for and filling positions, from hiring to promotions, in order to maintain a predominantly White workforce" and "I have witnessed the process in which Black applicants are weeded out based on name recognition and other factors." (Doc. # 32-10 at 2). He also referenced the Battalion Chief promotion, stating, "I expressed interest in the Shift Battalion Chief opening and was informed October 11, 2020 that a less experienced younger White male had been promoted ahead of me (David Everson, who was promoted to Lieutenant 4/1/2016 and Captain 4/1/2019)." (*Id.*). At the end of his charge, Plaintiff stated, "I believe that myself and others have been discriminated against due to our race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended." (*Id.* at 3).

Sometime on April 6, 2021, Chief Hill was informed of Plaintiff's EEOC charge via an email by the Homewood Chief of Staff.[4] (Doc. # 32-2 at 11). On this same day at 3:46 P.M., Chief Hill sent an email to the firefighters of the Homewood FD concerning the upcoming Annual Job Task. (*Id.* at 24). The email states in relevant part:

> The job task is the minimum requirements for the Alabama Fire College recruit school. Most of you have been firefighters for some time. You should have the experience and expertise to complete these tasks with little to no problem.
>
> Our goal is 100% success rate. The Job Task is not intended to be punitive. Rather is to insure that everyone can meet the <u>minimum</u> requirements for firefighting. Should a firefighter not complete the Job Task as designed they will be re-assigned to fire administration for remedial job training. The assignment will be Monday-Friday 8am-4pm for 90 days. At the end of the 90 days you will be required to retest.
>
> The remedial training will be a combination of fitness based training both cardio and resistance training, along with functional firefighting training. Should you like to retest prior to the 90 days then you will need to advise your supervisor in writing that you are ready to retest. Once you have successfully completed the job task you will return to your regular assignment. There will be no loss of pay or premiums during your remedial training.
>
> Again, it is not intended to be punitive, however if you are unable to complete the Job Task you pose a serious threat to yourself, your fellow firefighters and the public. The citizens of Homewood expect that you are mentally and physically prepared to do your job. Regardless of rank or position everyone that is a certified firefighter in Homewood Fire Department should be fit to fight fire.

(Doc. # 32-11 at 2).

Around April 21 or 22, 2021, prior to the start of the Annual Job Task, Broadhead received a letter from Dr. Thuss concerning Plaintiff's March 23, 2021 physical exam. (Doc. # 32-2 at 32). Broadhead gave this letter to Chief Hill. (*Id.* at 33). In his letter, dated April 21, 2021, Dr. Thuss stated the following:

---

[4] There is no evidence in the record as to when on April 6 the Homewood Chief of Staff sent the email to Chief Hill or when Chief Hill received the email. When asked whether he received the email "in the morning, midday, or late afternoon" Chief Hill responded, "I don't recall." (Doc. # 32-2 at 12).

[Plaintiff] was evaluated for his annual physical . . . on 3/23/2021. During this exam [Plaintiff] was presented with his laboratory results, which were discussed, and a physical exam was performed.

. . .

While [Plaintiff] verbalized no significant complaints during the recent examination there are new physical fitness requirements that the fire department requires the firemen to meet. These tests include, but are not limited to, the use of SCBA (positive pressure air supply) as well as physical strength and endurance tests.

[Plaintiff's] medical tests show changes that should be further evaluated before he undertakes the new physical testing.

 . . .

Therefore, while [Plaintiff] appears to be in relatively good health, it is my medical opinion that before he undergoes the new, additional strength and endurance physical testing that he should be evaluated by both Cardiology as well as Pulmonary specialists for clearance.

(Doc. # 32-12 at 2-3).

On or around April 22, 2021, after Chief Hill had read the letter from Dr. Thuss, he and Chief Swindle met with Plaintiff. (Doc. # 32-2 at 36). The conversation between them was recorded with everyone's knowledge. (Doc. # 32-14 at 2). Chief Hill told Plaintiff that "[t]he purpose of [the] meeting [was] to discuss with [him] his . . . annual physical." (*Id.*). He then proceeded to show Plaintiff the letter from Dr. Thuss. (*Id.*). Chief Hill explained, "Unfortunately, . . . your physical came back with some questions after being off for so long with COVID. . . . So that kind of puts us in a unique place." (*Id.*). Chief Hill told Plaintiff:

I can't let you take the job task, but the only thing I can do is reassign you up here until your cardiologist and pulmonologist understand the job requirements of a firefighter and whether you're fit for duty or not. And if they'll get that to Dr. Thuss and Dr. Thuss will revisit it, then you come back to full duty. We put you through the job task. You pass the job task. We put you back on the fire truck. And if you don't pass the job task, we can put you back up here – annual thing, physical fitness until you can pass the job task.

(*Id.* at 5-6). He also told Plaintiff "[A]t this point, the ball's in your court. We'll do whatever we can to help to get you back to being physically fit to fight fire, and we'll give you a limited duty . . . ." (*Id.* at 7). In their conversation, Plaintiff protested and cited how he had been riding the truck since he came back from work after his absence due to COVID. (*Id.* at 8). Chief Hill replied, "[U]ntil we get a better release from Dr. Thuss and until you pass the job task, I can't let you ride the fire truck. And that's going to happen to everybody who doesn't pass." (*Id.*).

Following this conversation, Plaintiff was placed on limited duty and reassigned to fire administration. (Doc. # 32-2 at 38). Sometime after he was placed on limited duty in April 2021, Plaintiff retired. (Doc. # 32-1 at 54).

In his deposition, Chief Hill testified that no other firefighters were precluded from taking the Annual Job Task. (Doc. # 32-2 at 34-35, 40). Chief Hill also testified that he did not receive any letters from Dr. Thuss about any other firefighters who had their physical exam done by Dr. Thuss. (*Id.* at 33).

## II.    Legal Standard

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on his allegations made in the complaint; instead, as the party bearing the burden of proof at trial, he must come forward with at least some evidence to support each element essential to his case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51). "[A]t the summary judgment stage the judge's function is not himself to weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## III.    Analysis

Plaintiff alleges that, under Title VII, his race was a motivating factor in Homewood's failure to promote him to the rank of Battalion Chief. (Doc. # 26 ¶ 1). And Plaintiff alleges that, under 42 U.S.C. §§ 1981 and 1983, Chief Hill, acting under color of state law in his individual capacity, retaliated against Plaintiff for opposing racially discriminatory promotion practices by removing him from active duty. (*Id.* ¶ 63). The court separately addresses Plaintiff's claim against the City of Homewood and his claim against Chief Hill, in turn.

### A.    Race Discrimination Claim Against the City of Homewood

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "Discrimination claims brought under Title VII may be pursued under a 'single motive' theory – in which the employee alleges that unlawful bias was the 'true reason' for an adverse employment action." *Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1321 (11th Cir. 2023). Or a plaintiff may employ "a mixed-motive theory – in which she alleges that bias was simply '*a* motivating factor for the adverse action, 'even though other factors also motivated the practice.'" *Id.* (quoting 42 U.S.C. § 2000e-2(m)) (emphasis added). In other words, "[t]he single motive theory is based on the idea that discrimination was the *only* reason for the termination, whereas the mixed-motive theory allows for liability to attach where discrimination was a motivating factor in the termination but the termination could have happened because of other, permissible reasons." *Cromartie v. Cent. Ala. Food Servs.*, 2023 WL 5197872, at *3 (M.D. Ala. Aug. 11, 2023).

Single-motive and mixed-motive discrimination claims can be established with either direct or circumstantial evidence. *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-102 (2003)). "Direct evidence of discrimination is 'evidence which, if believed, would prove the existence of fact in issue without inference or presumption,'" while "[c]ircumstantial evidence is evidence that suggests but does not prove a discriminatory motive." *Cromartie*, 2023 WL 5197872, at *5. Generally, when an employee bases his single-motive discrimination claim on circumstantial evidence, the court will apply the *McDonnell Douglas* burden-shifting framework. *Phillips*, 87 F.4th at 1321 (citing *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008)). Under this framework, the employee first must show a prima facie case of discrimination. *Quigg*, 814 F.3d at 1237 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Then, the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* Once the employer has done so, the employee then may attempt to demonstrate that the employer's proffered reason was, in fact, merely pretext for the employer's acts. *Id.*

Alternatively, claims brought under a mixed-motive theory "require the employee to show only that illegal bias . . . was *a* motivating factor for an adverse employment action, even though other factors also motivated the action." *Phillips*, 87 F.4th at 1327 (citations omitted) (emphasis added). "But, because the mixed-motive theory does not depend on 'proof of a single, 'true reason' for an adverse action,' an employee relying on circumstantial evidence is not required to satisfy the *McDonnell Douglas* burden-shifting framework." *Id.* (citing *Quigg*, 814 F.3d at 1327). Instead, he can survive summary judgment by "producing 'evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected

characteristic] was *a* motivating factor for the defendant's adverse employment action.'" *Id.* (citing *Quigg*, 814 F.3d at 1232-33).

In his response to Defendants' Motion for Summary Judgment, Plaintiff only refers to the mixed-motive theory. (*See* Doc. # 39). As the Eleventh Circuit has held, "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995). "Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Id.* Therefore, because Plaintiff only relies on a mixed-motive theory at summary judgment, the court does not consider whether Plaintiff satisfies the *McDonnell Douglas* burden-shifting framework. Accordingly, the court employs the mixed-motive causation framework to determine "'whether the plaintiff has presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that [his protected characteristic] was *a* motivating factor for [an] adverse employment decision.'" *Smith v. Off. Of Att'y Gen.*, 2020 WL 4015622, at *13 (M.D. Ala. July 16, 2020), *aff'd*, 2021 WL 5562958 (11th Cir. Nov. 29, 2021) (citing *Quigg*, 814 F.3d at 1239) (emphasis added).

As previously explained, the mixed-motive framework only requires a plaintiff to "produc[e] 'evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was *a* motivating factor for the defendant's adverse employment action.'" *Phillips*, 87 F.4th at 1327 (citing *Quigg*, 814 F.3d at 1232-33). Here, Plaintiff has satisfied the first prong because a denial of a promotion is an adverse employment action. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001); *Walker v. Mortham*, 158 F.3d 1177, 1187 (11th Cir. 1998). The second prong is a closer

call because the court must determine whether Plaintiff has presented sufficient evidence from which a reasonable jury could conclude that his race was a motivating factor in the decision not to promote him to the rank of Battalion Chief in fall 2020. The court finds that Plaintiff has met this burden.

Plaintiff relies on the convincing-mosaic theory to meet the second prong of the mixed-motive framework. "[The Eleventh Circuit] has used the phrase 'convincing mosaic' simply to recognize that courts must consider the totality of a plaintiff's circumstantial evidence on summary judgment." *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1342 (11th Cir. 2023). "A 'convincing mosaic' of circumstantial evidence is simply enough evidence for a reasonable factfinder to infer intentional discrimination in an employment action – the ultimate inquiry in a discrimination lawsuit." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946 (11th Cir. 2023); *see also Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "That evidentiary picture may include, 'among other things,' (1) suspicious timing or ambiguous statements, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Yelling*, 82 F.4th at 1342 (citing *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019)).

Plaintiff points to several pieces of circumstantial evidence that he contends support the inference that race was a motivating factor in the decision not to promote him to the rank of Battalion Chief in the fall of 2020: "Homewood's systematically poor track record of hiring and promoting Black firefighters" (Doc. # 39 at 15); "the notable gaps in experience between [Plaintiff] and the two white candidates for Battalion Chief who were selected over him" (*id.* at 16); and the internal matrix system that Homewood relies on to support its decision to promote Broadhead and Everson to Battalion Chief. (*Id.* at 17). For the sake of brevity, the court only considers the internal

matrix system and discusses why this Rule 56 evidence alone is sufficient to create a triable issue of fact on Plaintiff's Title VII claim.

Since the position was created, there have been nine or ten individuals employed as a Battalion Chief. (Doc. # 32-2 at 56). The position was previously selected by a panel of individuals who interviewed the candidates and evaluated their mission statements. (*Id.* at 43). However, when Chief Hill became the Fire Chief in 2020, he devised a new method for selecting individuals to fill the Battalion Chief position. (*Id.* at 46). The new method consisted of an interview by Chief Hill (as opposed to one conducted by a panel) (*id.* at 49), the applicants' resumes (*id.* at 50), and a matrix where the applicants' qualifications were assigned a number value for various levels of qualifications. (*Id.* at 44). In his deposition, Chief Hill testified that with the new method he *primarily* looked at the applicants' scores in the matrix and secondarily considered their resumes. (*Id.* at 45). And in its Motion for Summary Judgment (Doc. # 34), Homewood asserts that one of the legitimate, nondiscriminatory reasons for promoting the white candidates at issue here, Everson and Broadhead, to the position of Battalion Chief was because "[t]he evidence establishes" that "[Plaintiff] had a low score on the matrix Chief Hill developed." (*Id.* at 20). However, despite Chief Hill's testimony and Homewood's summary judgment argument, the matrix that Homewood submitted into evidence does not include Broadhead and Everson or their scores. (*See* Doc. # 32-4 at 2). When asked in his deposition, Chief Hill testified that he thought Everson "was close to" the score of 29 (Doc. # 32-2 at 50), which is the highest score recorded in the matrix. However, Homewood has not provided any Rule 56 evidence to confirm this. Further, while Everson's matrix score was discussed briefly, Chief Hill did not provide any information regarding Broadhead's matrix score or why he was not included on the matrix Homewood submitted into evidence. So, while the matrix indicates that Plaintiff received a score of 18 (*see*

Doc. # 32-4 detailing Plaintiff's score), which is the lowest score among the other candidates on the matrix, there is no way to compare Plaintiff's score to those of Broadhead or Everson. Plaintiff raised these discrepancies in his Response to Defendants' Motion for Summary Judgment. (Doc. # 39 at 17). Homewood made no effort to refute or even respond to this argument. (*See* Doc. # 41).

Moreover, although Chief Hill testified that he primarily relied on the matrix scores, when asked in his deposition why Broadhead and Everson were promoted over Plaintiff to the position of Battalion Chief, he discussed Broadhead and Everson's leadership skills (Doc. # 32-2 at 51, 54) and made no mention of their matrix scores. If Chief Hill had not testified that he looked primarily at the matrix scores when selecting the Battalion Chief position, there may be an argument that the court could overlook the issue that a matrix that did not reference the scores of the incumbents was submitted into evidence. However, Homewood has provided both incomplete (and potentially contradictory) evidence. Despite the fact that Chief Hill testified that promotion decisions for the Battalion Chief position are primarily based on the internal matrix system, neither of the two white candidates selected were included on the internal matrix system sheet that Homewood provided in its evidentiary submissions. Further, when asked why he selected them for the Battalion Chief positions, Chief Hill did not indicate Broadhead or Everson's scores.

The court finds that a reasonable jury could infer from this circumstantial evidence that Homewood's reasons for not promoting Plaintiff were pretextual. *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006) ("[A]n employer's deviation from its own standard procedures may serve as evidence of pretext."). And, as the court previously explained, pretext can form part of a convincing mosaic to establish that race was a motivating factor in a decision. *Yelling*, 82 F.4th at 1342. Moreover, "a plaintiff is entitled to survive summary judgment . . . if there is sufficient evidence to demonstrate the existence of a genuine issue of fact

as to the truth of each of the employer's proffered reasons for its challenged actions.") *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997). This evidence combined with Plaintiff's racial demographics illustrate that there are material issues of fact for a jury to resolve on Plaintiff's Title VII race discrimination claim against Homewood. Therefore, Defendants' motion for summary judgment on this claim is due to be denied.

### B.    Retaliation Claim Against Chief Hill

Plaintiff's Complaint also asserts a retaliation claim pursuant to §§ 1981 and 1983 against Chief Hill in his individual capacity. (Doc. # 26). Specifically, Plaintiff contends that Chief Hill retaliated against him by "subjecting Plaintiff to a successive physical examination without a valid medical reason and removal of Plaintiff from active duty in April 2021." (*Id.* ¶ 63). However, in his response to Defendants' Motion for Summary Judgment, Plaintiff concedes that the physical exam by Dr. Thuss was nothing more than a routine exam and was not retaliatory; therefore, he has abandoned his claim based on that exam. (*See* Doc. # 29 at 19 n.5). Therefore, the court only considers Plaintiff's retaliation claim against Chief Hill related to the removal of Plaintiff from active duty in April 2021.

"Title VII forbids an employer from retaliating against an employee because he has opposed 'an unlawful employment practice.'" *Willis v. Publix Super Markets, Inc.*, 619 F. App'x 960, 962 (11th Cir. 2015). Retaliation claims that arise in the race discrimination context are also cognizable under § 1981. *Id.* (citing *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 452-57 (2008)). Title VII and § 1981 retaliation claims are analyzed under the same framework. *Id.*; *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc). As previously discussed, the Eleventh Circuit "has 'primarily' relied on the *McDonnell Douglas* framework to evaluate circumstantial-evidence-based employment discrimination claims at summary judgment." *Yelling*,

82 F.4th at 1337. Under the *McDonnell Douglas* framework for retaliation, a plaintiff must first make out a prima facie case by showing that: "(1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relation between the two events." *McMillian v. Postmaster Gen., U.S. Postal Serv.*, 634 Fed. App'x 274, 277 (11th Cir. 2015) (quoting *Pennington*, 261 F.3d at 1266). Once a plaintiff successfully makes out a prima facie case, the burden shifts to the employer "to articulate a legitimate, nonretaliatory reason for the adverse action." *Tolar v. Bradley Arant Boult Cummings, LLP*, 997 F.3d 1280, 1289 (11th Cir. 2021). If the employer does so, "the burden shifts back to the plaintiff to establish that the reason offered by the [employer] was not the real basis for the decision, but a pretext for retaliation. *Id*. (citation and quotation marks omitted). "Importantly, throughout this entire process, the ultimate burden of persuasion remains on the employee." *Gogel*, 967 F.3d at 1135.

In the retaliation context, "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Lockheed-Martin Corp.*, 644 F.3d at 1328. Indeed, "[t]he *McDonnell Douglas* framework is . . . not the only way to prove retaliation; instead, it is *one* way to prove retaliation with circumstantial evidence." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1310 (11th Cir. 2023). "Without relying on the *McDonnell Douglas* framework, an employee may prove retaliation with any circumstantial evidence that creates a reasonable inference of retaliatory intent," *id.*, otherwise known as the convincing mosaic. *Id.* As the court explained above in relation to Plaintiff's Title VII claims, a plaintiff can survive summary judgment by relying on circumstantial evidence if the "circumstantial evidence raises a reasonable inference that the employer discriminated." *Id.* "At the end of the day, a retaliation plaintiff's 'mosaic' of evidence must still be enough to allow a reasonable jury to infer but-for causation."

*Id.* Put another way, "[w]hen an employee relies on circumstantial evidence of retaliation in opposition to summary judgment, she must present enough circumstantial evidence to create a genuine issue of material fact about the employer's retaliatory intent." *Id.*

Although Plaintiff may rely on *McDonnell Douglas* or the convincing mosaic approach for his § 1981 claims against Chief Hill, the mixed-motive theory is not available for such claims. As the Eleventh Circuit explained in *Yelling*, "[t]hough available for Title VII discrimination claims, it is well-established that the mixed-motive framework does not apply to Title VII retaliation claims." *Id.* at 1338 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). "Rather, to succeed on [a] retaliation claim, [the plaintiff] must show that her 'protected activity was a but-for cause of the alleged adverse action." *Id.* (quoting *Nassar*, 570 U.S. at 362). "The but-for standard asks 'whether a particular outcome would not have happened 'but for' the purported cause." *Id.* (quoting *Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020)). "Stated another way, a plaintiff must prove that had she not complained, she would not have been fired." *Id.* (citing *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018)). The "lessened" showing that a mixed-motive case requires "has no application to retaliation claims . . . or any other claim that requires but-for causation." *Id.* (citing *Nassar*, 570 U.S. at 360).

Based on Plaintiff's response to Defendant's Motion for Summary Judgment (Doc. # 39), the court is unsure whether Plaintiff wishes to proceed on his retaliation claim based on the *McDonnell Douglas* framework or through the convincing mosaic approach, as he makes references to both. Therefore, in order to be comprehensive, the court considers Plaintiff's retaliation claims under both theories.

### i.    *McDonnell Douglas*

The first step in the *McDonnell Douglas* framework requires Plaintiff to establish a prima facie case of retaliation by proving that (1) he engaged in statutorily protected conduct; (2) he suffered an adverse employment action; and (3) a causal relationship exists between the two events. *Tolar*, 997 F.3d at 1289. As to the first prong, neither party disputes that Plaintiff engaged in a statutorily protected activity when he filed his EEOC charge on March 28, 2021. (Docs. # 32-1 at 38; 31-10).

As to the second prong, the parties dispute whether Plaintiff has shown that he suffered an adverse employment action when he was placed on limited duty and reassigned to fire administration. (Doc. # 32-2 at 38). A materially adverse action is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006); *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 861 (11th Cir. 2020). As the Supreme Court recently explained in its decision in *Muldrow v. City of St. Louis, Mo.*, a plaintiff "need only show some injury respecting her employment terms or conditions. [A] transfer must have left [the plaintiff] worse off, but need not have left her significantly so." 601 U.S. 346, 359 (2024). "A plaintiff no longer must show that the 'adverse action specifically involve[d] a reduction in pay, prestige, or responsibility' or that the transfer *substantially* 'altered the employee's compensation, terms, conditions, or privileges of employment, deprived . . . her of employment opportunities, or adversely affected his or her status as an employee." *Bennett v. Butler Cnty. Bd. of Educ.*, 2025 WL 27598, at *3 (M.D. Ala. Jan. 3, 2025) (quoting *West v. Butler Cnty. Bd. of Educ.*, 2024 WL 26987987 (11th Cir. May 24, 2024)). Chief Hill argues that Plaintiff "was in no way demoted." (Doc. # 34 at 28). Instead, he explains it was a "temporary reassignment until Plaintiff was cleared to take the Annual Job Task." (*Id.*).

Chief Hill also asserts that Plaintiff "was to have the same pay and the same rank – [it] was merely a different assignment." (*Id.*)

In response, Plaintiff contends that the reassignment was an adverse employment action because "it is undeniable that the entire terms of [Plaintiff's] job would have been altered" as "[h]e would have transitioned involuntarily from a leadership management-level role over firefighters to some undefined set of desk responsibilities." (Doc. # 39 at 21). Here, at least for Rule 56 purposes, Plaintiff's reassignment qualifies as an adverse employment action because "reduction in pay, prestige, or responsibility" can constitute an adverse action. *Hinson v. Clinch Cnty.*, 231 F.3d 821, 829 (11th Cir. 2000). The summary judgment record indicates that Plaintiff was taken off the firetruck and placed on limited duty, where he was to be assigned desk responsibilities. (Doc. # 32-2 at 38). This certainly illustrates a reduction in responsibility because Plaintiff would no longer be riding the firetruck to fight fires.

And, as to the third prong, the court must consider the causal relationship between the protected activity and the adverse employment action. "A 'close temporal proximity' between the protected expression and an adverse action is sufficient circumstantial evidence of a causal connection for purposes of a prima facie case." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (citing *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998)). The court construes the causal link element broadly so that "a plaintiff merely has to prove that the protected activity and the . . . [adverse] action are not completely unrelated." *Olmsted*, 141 F.3d at 1460. Even a one-month period between the protected expression and the adverse action can give rise to an inference of causation. *See Higdon*, 393 F.3d at 1220 (citing *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998)). Here, Plaintiff filed his EEOC charge on March 28, 2021 (Doc. # 32-1 at 39; Doc. # 31-10), Chief Hill was notified of the EEOC charge on April 6, 2021

(Doc. # 32-2 at 11), and Plaintiff was placed on limited duty on or around April 22, 2021 (Doc. # 32-2 at 38). This close temporal proximity – about one month in between the protected activity and the adverse action – could establish a causal relationship. But, that does not end the inquiry.

In certain circumstances, the causal chain can be broken by intervening acts. *Ramos v. Delphi Behav. Health Grp., LLC*, 2022 WL 1415856, at *4 (11th Cir. May 4, 2022). Plaintiff saw Dr. Thuss on March 23, 2021 for his physical exam (Doc. # 32-2 at 13), which was before he filed his EEOC charge on March 28. (Docs. # 32-1 at 38; 31-10). Dr. Thuss subsequently wrote and sent his letter concerning Plaintiff's physical exam, which was dated April 21, 2022 (Doc. # 32-12), and Chief Hill read the letter on or around April 22, 2021 (Doc. # 32-2 at 33), before his conversation with Plaintiff in which he placed him on limited duty. (*Id.* at 36). It is undisputed here that Dr. Thuss's letter serves as an intervening act. In his letter, Dr. Thuss stated, "[Plaintiff's] medical tests show changes that should be further evaluated before he undertakes the new physical testing" and "while [Plaintiff] appears to be in relatively good health, it is my medical opinion that before he undergoes the new, additional strength and endurance physical test that he should be evaluated by both Cardiology as well as Pulmonary specialists for clearance." (Doc. # 32-12 at 2-3). After receiving this letter, Chief Hill had a valid reason, unrelated to the "statutorily protected activity," to place Plaintiff on limited duty. Moreover, in the conversation with Plaintiff, Chief Hill expressed concern over Plaintiff's health based on the information Dr. Thuss provided in his letter and informed Plaintiff that he would need to be cleared by a doctor before taking the Annual Job Task. (Doc. # 32-14 at 5-6). Chief Hill placed Plaintiff on limited duty due to these health concerns, which were identified by Dr. Thuss. Because Dr. Thuss's letter is an intervening act that severed the causal link between Plaintiff's EEOC charge and his assignment to limited duty, Plaintiff has failed to establish a prima facie case of retaliation.

But, even if Plaintiff could establish a prima facie case of retaliation (and, to be clear, on this record he cannot), Chief Hill has provided a legitimate, non-retaliatory reason for putting Plaintiff on limited duty. Pursuant to the advice in Dr. Thuss's letter, Chief Hill placed Plaintiff on limited duty until he could be evaluated by a doctor, and then he would be able to take the Annual Job Task. (Doc. # 32-14 at 5-6). Because Chief Hill has provided a legitimate, non-retaliatory reason, the burden would shift back to Plaintiff to show that the offered non-retaliatory reason was pretextual.

Plaintiff has not established that Chief Hill's justification for placing Plaintiff on limited duty was pretextual. In his attempt to do so, Plaintiff contends that Chief Hill's April 6, 2021 email to the Homewood FD (Doc. # 32-11 at 2) is suspicious in its timing because on that same day, Chief Hill received notice of the EEOC charge. (Doc. # 32-2 at 11). Chief Hill's April 6 email stated that those who failed the Annual Job Task would be placed on administrative duties for a period of ninety days until they were re-tested. (Doc. # 32-11 at 2). Plaintiff urges the court to find that a material issue of fact is raised because Chief Hill implemented a new consequence for failing the Annual Job Task on the same day that he was notified about Plaintiff's EEOC charge. Plaintiff notes that in Chief Hill's prior communications with the Homewood FD he had not said that failure of the Annual Job Task would result in reassignment to administrative duties. (*See* Docs. # 32-5 at 2, 7 (detailing the meeting minutes from the August 6, 2020 staff meeting where Chief Hill first brought up the Annual Job Task); 32-7 at 2 (email from Chief Hill to the Homewood FD discussing the Annual Job Task)).

There are substantial gaps in Plaintiff's argument. As an initial matter, the court cannot conclude that Chief Hill sent the email to the Homewood FD about the Annual Job Task *after* he received the email notifying him about Plaintiff's EEOC charge because there is no evidence in

the Rule 56 record establishing when Chief Hill received the email about the EEOC charge. (*See* Doc. # 32-2 at 12 (Chief Hill testifying that he does not recall when he received the email about the EEOC charge)). However, even if the court were to assume that Chief Hill sent the email to the Homewood FD after he was notified of the EEOC charge, this still does not establish pretext. First, Plaintiff was not placed on limited duty because he failed the Annual Job Task. In fact, he did not even take the Annual Job Task. Second, Plaintiff was placed on limited duty because of a letter from a physician. And, in that letter, Dr. Thuss expressed a concern about Plaintiff participating in the Annual Job Task. And third, Plaintiff was not placed on limited duty for a period of ninety days, which was the consequence Chief Hill outlined for failing the Annual Job Task. Plaintiff was only placed on limited duty until he was cleared by a doctor to take the Annual Job Task. For these reasons, Plaintiff has not pointed to any Rule 56 evidence indicating that Chief Hill's justification for putting him on limited duty was pretextual. Therefore, Plaintiff has failed to establish retaliation under the *McDonnell Douglas* framework.

### ii. Convincing Mosaic

The "convincing mosaic of circumstantial evidence" analysis can be applied to retaliation cases. *See Berry*, 84 F.4th at 1310. "When an employee relies on circumstantial evidence of retaliation in opposition to summary judgment, she must present enough circumstantial evidence to create a genuine issue of material fact about the employer's retaliatory intent." *Id.* "A genuine issue exists if the evidence, viewed in the light most favorable to the employee, would allow a reasonable jury to infer that the employer engaged in intentional retaliation." *Id.* As noted previously, a plaintiff may establish a "'convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination' by pointing to evidence that demonstrates (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent

may be inferred; (2) systematically better treatment of similarly-situated employees; and (3) pretext." *Lukie v. MetLife Group, Inc.*, 2024 WL 4471109, at *8 (11th Cir. Oct. 11, 2024) (citing *Lewis*, 934 F.3d at 1185). But, here, Plaintiff has failed to proffer sufficient evidence for his claim of retaliatory intent.

Again, Plaintiff argues that there is suspicious timing as to Chief Hill's April 6, 2021 email because it was sent on the same day that Chief Hill was notified of the EEOC charge. (Doc. # 39 at 22-23). As discussed previously, the court finds this argument without merit. Plaintiff has not demonstrated pretext with this "suspicious timing" argument. And, to the extent that Plaintiff argues there is evidence of pretext because no other firefighter was precluded from taking the test and reassigned to limited duty (*id.* at 24), this argument is also meritless. While it is true that no other firefighter was precluded from taking the Annual Job Task (Doc. # 32-2 at 34-35, 40), it is also undisputed that Chief Hill did not receive a similar letter from a doctor regarding any other firefighter. (*Id.* at 33).

In sum, the circumstantial evidence cited by Plaintiff – even when viewed in the light most favorable to him – does not create a reasonable inference of intentional retaliation. Therefore, summary judgment is due to be granted as to Plaintiff's claims for retaliation against Chief Hill.

**IV.    Defendants' Motion to Strike**

After Plaintiff filed his response to Defendants' Motion for Summary Judgment (Doc. # 37), Defendants filed a Motion to Strike Evidence Submitted by Plaintiff Opposing Summary Judgment. (Doc. # 40).

In their motion, Defendants move to strike three items of evidence filed by Plaintiff in his response to Defendants' Motion for Summary Judgment: (1) the EEOC charge of Tony Franklin (Doc. # 37-2); (2) Homewood's position statement in response to Franklin's EEOC charge (Doc.

# 37-3); and (3) portions of Plaintiff's declaration. (Doc. # 37-1). Defendants move to strike the

EEOC charge of Tony Franklin because they argue that it was not disclosed as required under the

Federal Rules of Civil Procedure and because it consists of inadmissible evidence. Defendants

move to strike Homewood's position statement in response to Franklin's EEOC charge because

they argue that it also is inadmissible evidence. And finally, Defendants move to strike portions of

Plaintiff's declaration because they argue that it consists of facts which are not relevant and about

which Plaintiff lacks personal knowledge.

Because the court did not consider any of this evidence in analyzing Defendants' Motion

for Summary Judgment (Doc. # 33), Defendants' Motion to Strike (Doc. # 40) is due to be denied

as moot.

## V.    Conclusion

For the reasons discussed above, Defendants' Motion for Summary Judgment (Doc. # 33)

is due to be granted in part and denied in part, and Defendants' Motion to Strike Evidence

Submitted by Plaintiff Opposing Summary (Doc. # 40) is due to be denied as moot. An order

reflecting this memorandum opinion will be entered contemporaneously.

**DONE** and **ORDERED** this January 24, 2025.

**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE